Kenneth W. JENKINS et ux., Petitioners-Plaintiffs,

v.

The COMMODORE CORPORATION SOUTHERN et al., Respondents-Defendants.

Supreme Court of Tennessee.

July 2, 1979.

Rehearing Denied Aug. 20, 1979.

Edward Sempkowski, Gary E. Brewer, Morristown, Fred L. Myers, Newport, for petitioners-plaintiffs.

John W. Wheeler, Knoxville, Hodges, Doughty & Carson, Knoxville, of counsel, for the Commodore Corp. Southern.

James C. McSween, Jr., Newport, for Freeman Mobile Home Sales, respondents-defendants.

## OPINION

HARBISON, Justice.

This action was brought by petitioners, plaintiffs below, for the wrongful death of their two-year-old son. The child was critically burned in a fire which destroyed the mobile home of petitioners. Defendants to the action were the manufacturer of the mobile home and the local dealer from whom petitioners purchased it at retail.

The case was submitted to the jury as to both defendants, respondents here, on theories of negligence, strict liability and breach of implied warranty. Both defendants denied liability and in addition contended that the plaintiffs were guilty of contributory negligence or assumption of risk.

The issues were sharply drawn, and the evidence highly conflicting. The principal claim of the petitioners was that an electric heater, or furnace, in the mobile home was defectively or improperly wired, and that it had malfunctioned for several weeks prior to the fire. The mobile home was purchased new and had been used by petitioners for approximately one year prior to the date of the fire, November 11, 1973. During the first winter of its use, petitioners had experienced no difficulty with the heating unit, but beginning in September 1973, when they again attempted to use it during cool weather, it failed properly to heat their home. Petitioners testified that they called this matter to the attention of the local dealer on several occasions and that he promised to send a service representative or repairman to investigate and make necessary repairs. He failed to do so, however, and in the interim petitioners testified that they simply followed instructions given to

them by the dealer, which included re-engaging automatic switches on circuit breakers. They testified that on several occasions these switches had opened, cutting off current to the heating unit. Petitioner Kenneth W. Jenkins, father of the deceased child, testified positively that the fire which destroyed the trailer originated in this malfunctioning electric furnace. No evidence to the contrary, direct or circumstantial, was introduced by respondents.

Sharp issues of credibility of the parties developed at the trial. The dealer unequivocally denied receipt of any complaints by the petitioners concerning the heating unit. He indicated that the unit was still under warranty and that had he been notified of its improper functioning, he would have had proper attention given to it by a representative of the firm which manufactured the furnace.

Petitioner Kenneth W. Jenkins and other witnesses on his behalf testified that after the fire they examined the remains of the electric furnace and could find no evidence of copper wiring therein. It was their theory that the unit had been equipped with aluminum wiring, which, over a period of several months' use during the winter of 1972–1973, had loosened from its fastenings, creating a situation resulting in arcing and overheating. Petitioners testified that they had detected an odor and had heard the sound of arcing electricity when they attempted to use the heater in the fall of 1973. Traces of melted aluminum were found in the ruins of the unit which, petitioners insisted, corroborated their theory that aluminum wiring had been used.

The manufacturer positively denied that aluminum wiring had been used when this unit was manufactured in 1972. Initially, however, its representative had testified on discovery deposition that he did not know whether the wiring was aluminum or copper. At trial, he testified that he had checked his records and had found that the company was not purchasing aluminum wiring for heating units during the period when this mobile home was manufactured, but he admitted that the company had used aluminum wiring at a later time, during 1974.

The fire which destroyed the mobile home was sudden and catastrophic. In the dense smoke which was emitted, petitioner and his wife lost contact with their two-year-old son, who was at that time their only child. The father was able to assist the mother out of the rear door of the trailer, nearest their bedroom, and frantically searched through the trailer in blinding smoke and intense heat, looking for the child, until he, too, was forced to leave by the rear door. He ran around the trailer and forced open the front door into the living room. He heard cries from the child and finally located the terribly burned infant. The child appeared to be unconscious when taken from the trailer, and the parents at first thought that he had died. He lived for an additional two and one-half days, however, before finally succumbing from his extensive burns. There is little evidence that he was conscious after having been found by his father, except that on one occasion in the hospital he was heard to call for his father.

Although petitioners, by amendment to their complaint, claimed punitive damages against the dealer, no issue as to punitive damages was submitted by the trial judge as to either of the defendants. After receiving the charge of the court, the jurors deliberated a little less than one hour and returned a verdict in favor of petitioners for $250,000, the amount of compensatory damages alleged in the complaint.

Both defendants filed a motion for posttrial relief, asserting errors in failure to direct a verdict, in the admission and exclusion of evidence and in the jury instructions as well as in the amount of the verdict. The trial judge overruled all assignments of error except those pertaining to the amount. He found that the verdict of the jury was excessive and suggested a remittitur of $100,000. This remittitur was accepted by the plaintiffs without protest. Defendants nevertheless appealed to the Court of Appeals, still asserting numerous trial errors together with excessiveness of

the verdict and a charge that the verdict was the result of passion, caprice or prejudice on the part of the jurors.

The Court of Appeals considered a number of the assignments of error made by the defendants, including their entitlement to a directed verdict, and concluded that jury issues were fairly raised by the evidence both as to theories of liability asserted by the plaintiffs and as to the defenses asserted by the defending parties. It did not discuss a number of assignments of error respecting instructions given to the jury by the trial judge.

From its review of the record, however, the Court of Appeals was of the opinion that the verdict was so shockingly excessive and the result of such apparently brief deliberation as to evidence jury misconduct. It concluded that the verdict was the result of passion, prejudice or unaccountable caprice on the part of the jurors. It accordingly held the verdict to be a nullity and ordered a new trial on all issues. The Court of Appeals did not attempt further to correct the verdict by suggesting an additional remittitur nor did it comment upon the reasonableness of the judgment as modified by the remittitur which had been suggested and accepted.

We have carefully reviewed the record in this case. While we agree with the Court of Appeals that the verdict originally rendered by the jury was excessive, as found by the trial judge and as now conceded by counsel for petitioners, nevertheless we are unable to concur in the conclusion of the Court of Appeals that the verdict was the result of jury misconduct. There is no extrinsic evidence whatever to support that conclusion. While the period of deliberation by the jurors was fairly short, the issues on liability were quite clear-cut and sharply drawn. Although the evidence was conflicting, no great period of time was necessarily involved in reaching a decision on the disputed issues. We therefore do not believe that the period of time consumed in jury deliberations warrants a conclusion of jury misconduct in the present case.

Nor are we able to conclude that the amount of the verdict rendered by the jury, despite its excessiveness, manifested any undue emotion, prejudice, or improper motive on the part of the jurors.

In this connection, although this Court rarely comments upon the tactics or strategy employed at the trial of cases, in view of the disposition made of this case by the Court of Appeals we feel constrained to comment briefly upon some issues which were injected into the record by one of the defending parties and not objected to by any other party. These were such, in our opinion, as might well give pause to experienced counsel in a jury trial for the wrongful death of a child. Had these tactics proved successful, they might have resulted in a verdict for the defendants, but, in the event of their failure, they were certainly not calculated to win the sympathy of the jury toward the party advancing them.

Petitioners in this case were young parents who had tragically lost their first-born child following very terrible injury in which there was at least some conscious pain and suffering. There was nothing whatever in the record to suggest anything more than ordinary contributory negligence or lack of care on their part. The dealer himself proved that there was a great deal of community sympathy for these young parents, who had lost their child, their home and all of their possessions. The dealer testified that he personally made a contribution to a fund being raised on behalf of the petitioners by sympathetic members of the community, and he exhibited in evidence a check which he had given for that purpose.[1]

During the cross-examination of Mr. Jenkins, however, as to whom there was no other evidence or suggestion of bad character, reputation or misconduct, counsel for the dealer asked the following questions and received the following answers regard-

---

1. There was a discrepancy between this testimony and that of Mr. Jenkins, in that the dealer testified that he personally gave Jenkins the check, while Jenkins said that he recalled no conversation with the dealer but received the check along with a group of others.

ing the use of an extra bedroom in the trailer:

"Q. Did you store anything in the closet in there, in that room?

"A. No.

"Q. Do you remember ever telling anybody that in that closet was where you kept your moonshine whiskey?

"A. No, sir, I'm 30 years old and I take oath to die right now I've never tasted of whiskey, beer or liquor or smoked no grass either.

"Q. That wasn't what I asked you, I appreciate your testimony, but did you sell it—

"A. No, sir.

"Q. Or store it for anybody?

"A. No, sir.

"Q. Did you ever tell anybody, even jokingly, that's what you had in the closet?

"A. No, sir."

Having laid this foundation, counsel for the dealer later introduced the testimony of the dealer's son-in-law, who was an employee of the dealership and, therefore, hardly a disinterested witness. This witness testified that he had talked with Mr. Jenkins on several occasions about their common interest in bear hunting, and he then gave the following testimony:

"Q. Alright, did he ever give you any indication of what he had in the mobile home of an unusual nature?

"A. Yes, sir.

"Q. Would you just relate to the jury in your own words now where this conversation took place, now it came about and what he said?

"A. Okay, Mr. Jenkins and I had one thing kindly in common was hunting, and he was all the time talking about bear season, you know, and bear hunting and would I be interested in going with him and I told him yes, I felt one day I would, you know, like to go with them, and during this conversation he said he had some good moonshine that he would—I told him, I said, 'well, I would be glad to go bear hunting, as far as the moonshine I would lay off that.' And on numerous occasions Mr. Jenkins would talk about, you know, the bear season, about hunting, how many he had killed, and things of this nature, and I was invited but I never did have the opportunity to go with them.

"Q. Did he ever tell you where he kept the moonshine?

"A. Yes, sir, he said that he kept it in his mobile home, that any time we would, you know, have access to it if we did go hunting.

"Q. Did he tell you where in the mobile home he kept it?

"A. In the closet, in the bedroom, the small bedroom, which is directly behind the furnace . . .

"Q. Have you ever seen Mr. Jenkins when he had been drinking?

"A. Yes, sir.

"Q. You have any idea what his character and reputation is as far as drunkenness or sobriety?

"A. Well, as far as the drunkenness part, you know, I couldn't say any relationship with that, but I have been with him on occasions when he had been drinking . . . ."

On rebuttal, Mr. Jenkins took the stand and categorically denied this testimony.

The trial of a case of this nature, involving the death of a young child, is almost bound, under any circumstances, to generate an atmosphere of emotion or sympathy. For a defendant to inject evidence such as the foregoing, unless it could be almost conclusively established, represents a trial strategy which, at a minimum, may be two-edged in nature. Although the testimony was injected without objection, its relevance, if any, on this trial record seems to be slight. Had it been believed by the jury, it might have destroyed the petitioners' case. On the other hand, if it were rejected—as it undoubtedly was—it might have had exactly the opposite effect, and might

have created a distinctly unfavorable impression in the minds of the jurors, because this evidence, in effect, accused a young father of drunkenness and illegal activity which the dealer, in some way, was attempting to relate to the death of the child.

 Therefore, from our examination of this record, any emotion in the minds of the jurors legitimately and naturally flowed from the tragic facts of the case or from tactics employed by counsel for the defense and cannot be categorized as improper or unjustified. It is not every "passion" or emotion which is tantamount to jury misconduct. As stated by this Court many years ago, in the case of *Reeves v. Catignani*, 157 Tenn. 173, 176, 7 S.W.2d 38, 39 (1928):

"The right to revise even the amount of the verdict by the process of suggesting a *remittitur* is a delicate one and one that a court should be slow to adopt; and if it should appear that there was in the verdict an element of actual corruption, we think the proper course would be to set it aside. The words 'passion, prejudice or caprice' indicate that the jury was, in the opinion of the court, swayed to a more or less extent by their feelings, which after all are human and are not inconsistent with an honest intention, while, on the other hand, a verdict that is infected with the corruption of one or more of the jurors is to that degree a dishonest verdict." [2]

Probably the classic cases in this state in which a jury verdict was held not to be the result of improper passion, caprice or prejudice, despite the fact that it clearly reflected emotion and indignation, is that of *Arnett v. Fuston*, 53 Tenn.App. 24, 378 S.W.2d 425 (1963). In that case, which involved an action for wrongful death against the operators of two automobiles, one of the drivers was exonerated. The other, who had been drinking, was the recipient of the following verdict:

"We declare L. D. Fuston guilty of charge and recommend a judgment of Thirty thousand dollars against him and punitive damages from 1 to 5 years in prison." 53 Tenn.App. at 27.

While the reader of the opinion is left to imagine the eloquence with which counsel for the plaintiff must have castigated that defendant and can only guess what emotions were enkindled in the minds of the jurors, nevertheless the award for "punitive damages" was held by both the trial and appellate courts to amount to nothing more than "surplusage," and the remainder of the verdict was upheld.

 We have already stated that we think, as did the courts below, that the verdict rendered by the jury in the present case was substantially excessive. It did not, however, exceed the amount sued for, and the fact that it was rendered in the maximum amount claimed in the complaint does not, in and of itself, render it invalid or improper.

 While excessive, in our opinion the verdict was one which could properly be corrected by use of the broad powers of the trial and appellate courts of remittitur. *See Smith v. Shelton*, 569 S.W.2d 421 (Tenn. 1978). The trial judge made use of this power, and the Court of Appeals, if it had seen fit to do so, might have suggested a further remittitur or a restoration, in part or in whole. It did not do so, but, erroneously in our opinion, treated the verdict of the jury as a nullity.

It was for this reason that we granted the petition for certiorari filed on behalf of the original plaintiffs. There were a number of assignments of error which had been made in the Court of Appeals by the defendants which were pretermitted by that Court. Neither of the defendants, however,

2. This case and a number of others were seemingly disapproved by the Court of Appeals in *Kaiser v. Cannon*, 529 S.W.2d 235 (Tenn.App. 1975) on constitutional grounds. While we agree with the statements in that opinion that a jury must be fair and impartial, we do not believe that a verdict is constitutionally unsound merely because it is excessive or inadequate, or that parties may deliberately employ incendiary tactics and then charge jury misconduct when these fail.

saw fit to preserve these issues by filing a cross-petition for certiorari or assignments of error in this Court after the plaintiffs' petition was granted. T.C.A. § 27–823.

The only issue in the case, therefore, in its posture before this Court, is whether or not the verdict of the jury should have been treated as a nullity by reason of misconduct. Since we have concluded that it should not, we are constrained to reinstate the verdict as modified by the trial court and remand the cause to that court for enforcement of the judgment and for such further orders as may be necessary or proper. All costs in the cause are adjudged against the respondents.

HENRY, C. J., and COOPER, FONES and BROCK, JJ., concur.