**Thelmarine STEELE and Tommy Steele, Plaintiffs/Appellees,**

v.

**FT. SANDERS ANESTHESIA GROUP, P.C., et al., Defendants/Appellants.**

Court of Appeals of Tennessee, Eastern Section.

Nov. 29, 1994.

Permission to Appeal Denied by Supreme Court April 3, 1995.

R. Hunter Cagle, Robert H. Green, Knoxville, for defendants-appellants.

Sidney Gilreath, Donna Keene Holt, Knoxville, for plaintiffs-appellees.

## OPINION

LEWIS, Judge.

Defendant, Ft. Sanders Anesthesia Group (Ft. Sanders), has duly perfected its appeal from the judgment entered by the trial court on the jury's verdict awarding plaintiff Thelmarine Steele the sum of $5,600,809.90 as damages for injuries she received as a result of the alleged negligence of defendant and awarding plaintiff Tommy Steele the sum of $2,000,000.00 for loss of consortium of his wife, Thelmarine Steele.

Plaintiff Thelmarine Steele was employed as a senior secretary for Martin Marietta in Oak Ridge, Tennessee. She had worked at Martin Marietta since 1974. In October 1988, she was admitted to Ft. Sanders Regional Medical Center to undergo surgery on her neck. Prior to her employment with Martin Marietta, she worked as a legal secretary.

Prior to her surgery, Thelmarine Steele had been experiencing some mild neurological symptoms due to compression of the spinal cord in her neck. These symptoms were a result of arthritis. Mrs. Steele's condition was fairly common and the surgery recommended to correct her problem was a commonly performed neurosurgical procedure known as a decompressive surgical laminectomy. This operation normally has a 90% probability for effecting a good result.

Mrs. Steele worked until the day before she entered the hospital and was able to walk into the hospital. The surgery was performed, and when she awoke she was paralyzed from her neck down. Dr. John Neblett performed the surgery, and the anesthesia was provided by the Ft. Sanders Anesthesia Group. The plaintiffs, as a result of Thelmarine Steele's injuries, filed suit in October 1989 against Dr. Neblett, Ft. Sanders Anesthesia Group, and several of the Ft. Sanders Anesthesia Group employees. These employees were later dismissed by voluntary nonsuit.

The case was first tried beginning 13 July 1992. The jury determined that Dr. Neblett was not negligent, but that Ft. Sanders was negligent in the care rendered to Mrs. Steele. A mistrial was entered when the jury could not reach agreement on whether Ft. Sander's negligence was the proximate cause of plaintiff Mrs. Steele's injuries. The case was tried again in May 1993.

At the second trial, Dr. Clark Watts, a neurosurgeon and former editor of *Neurosurgery Journal,* testified on behalf of the plaintiffs that a prolonged period of low blood pressure during the time the plaintiff Mrs. Steele was under anesthesia was the cause of Thelmarine Steele's paralysis. Dr. Ronald Vinik, an anesthesiologist at the University of Alabama at Birmingham, testified that Ft. Sanders deviated from the standard of care, and he testified that within a reasonable degree of medical certainty, the prolonged drop in blood pressure was the cause of plaintiff Thelmarine Steele's paralysis. Joan Bruening, a certified registered anesthetist, also testified that Ft. Sanders deviated from the standard of care in the treatment rendered to plaintiff Mrs. Steele.

The defendant offered expert testimony that there was no deviation in the standard of care and the treatment rendered to Mrs. Steele.

However, the jury found in favor of the plaintiffs and, as we have stated, returned a verdict of $5,600,809.90 for Mrs. Steele and $2,000,000.00 for Mr. Steele.

Defendant moved for a new trial which was denied. However, the trial court did suggest

a remittitur in the verdict rendered in Mr. Steele's favor, reducing recoverable damages to $1,200,000.00 for the loss of consortium claim. Mr. Steele accepted the remittitur under protest.

On appeal, the defendant alleges the trial court erred in: (1) allowing Dr. Watts and Ms. Bruening, two of plaintiffs' expert witnesses, to testify; (2) allowing plaintiffs' counsel to cross-examine defendant's expert, Dr. Purvis, with portions of the deposition Dr. Purvis read and considered in reaching his opinion; and (3) approving the verdict of Mr. Steele as remitted and of Mrs. Steele to include recovery of $500,809.90 in medical expenses, which had been incurred by her as of the date of the trial.

Dr. Neblett, prior to scheduling surgery on plaintiff Mrs. Steele, had x-rays made of her spinal cord, which was compressed by a build up of bony arthritic spurs, causing narrowing of her spinal canal. This pressure on her spinal cord caused intermittent, neurological symptoms that led her to seek treatment. Dr. Neblett's surgery was expected to relieve the pressure by removing a portion of the bone so that the spinal cord would no longer be compressed.

Dr. Neblett elected to perform the surgery in the "seated position" wherein the patient is placed in a more upright position, rather than lying prone on the operating table. The positioning of the patient is selected as a matter of the surgeon's judgment. There are benefits to the seated position from a surgeon's point of view.

There are some increased risks in the management of the anesthesia when a patient is operated on in the seated position. Operation in a seated position is unique to neurosurgical procedures and presents a risk for anesthesia and the management of the patient's blood pressure because of the effects of gravity. Blood pressure drives the blood to the tissues of the body. When the blood pressure is not adequately supplied it suffers from ischemia, the lack of blood supply, and tissue will die. A risk of operating in the seated position is quadriplegia from an ischemia injury to the spinal cord, if the blood pressure is not maintained at an adequate level to assure blood supply to the tissue, also known as perfusion.

The risk of quadriplegia from low blood pressure, hypotension, is a well recognized risk of operating on a patient in the seated position. Expert witnesses testifying for both the plaintiffs and the defendant agreed that the seated position presents an increased risk for the management of anesthesia and that ischemic injury to the spinal cord could result if the blood pressure is not maintained at the level that would assure adequate perfusion of the tissue. Experts testifying for both sides agreed that a spinal cord under compression was at further additional risk since a spinal cord under compression would be more susceptible to ischemic injury.

To insure adequate perfusion of the spinal cord tissue at the neck during a seated position type of surgery, anesthesia personnel must adequately monitor the blood pressure to be assured there is enough pressure for the blood supply to reach the area which is being operated on. It is the blood pressure at the diseased area of which the operation is being performed that is important to monitor. Because of the effects of gravity when the patient is in the seated position, pressure at the neck will be lower than it is at the heart level, or as would be measured by a blood pressure cuff at the arm. If blood pressure is monitored by the use of a cuff placed on the arm, then a mathematical calculation must be made by the person managing the anesthesia to adjust for the difference. The experts agreed that the calculation requires an adjustment of two millimeters of mercury for every inch the operative site is above the heart. Since plaintiff Mrs. Steele was being operated on in the seated position, the blood pressure at the site of the surgery was approximately twenty millimeters of mercury lower than the blood pressure reading being recorded at the arm.

Dr. Basia Jenkins, president of Ft. Sanders Anesthesia Group, also participated in Mrs. Steele's care, and, at the time of trial, testified for the defendant. Dr. Jenkins agreed that the standard of care: (1) requires the anesthesia provider to know the nature and seriousness of the risk to the

patient so adequate precautions can be taken to protect the patient; (2) requires blood pressure to be maintained at sufficient levels to feed tissue with oxygen and nutrients; (3) requires the anesthesia personnel to know before the surgery begins, the medical or surgical conditions of the patient that could pose a problem with respect to maintaining adequate blood pressure; (4) requires the anesthesia personnel to know the medical or surgical condition of the patients that could make particular tissue more fragile and thus require additional blood flow; and (5) requires the anesthesia personnel to know and carry out the precautionary measures, the monitoring techniques, and the treatments required to maintain the blood pressure at levels sufficient to perfuse the tissue.

Dr. Mumford[1] conducted the preoptive examination and review of the chart the night before surgery, as required by the Ft. Sanders medical staff by-laws for the Anesthesiology Department, as well as required by good practice, and made his entry on the chart. His note did not make any mention of the diagnosis for which the patient was having surgery, what the operative procedure was to be, any preoptive average blood pressure readings, or that Mrs. Steele's spinal cord would be under compression.

The afternoon following Dr. Mumford's examination, Dr. Jenkins attended plaintiff Mrs. Steele in the holding area and placed a central line to monitor her for the embolus and made her note on the chart, without referring to the diagnosis for which surgery was being performed or the fact that her spinal cord was under compression.

Plaintiff Mrs. Steele was then taken to the operating room and the anesthesia was administered by Dr. Beamer. After Dr. Beamer put Mrs. Steele to sleep, he turned her care over to June Hodges, who administered anesthesia to her for some fifteen minutes before turning her care over to Charles Hodges, who continued to administer the anesthesia for the remainder of the surgery.

Charles and June Hodges were husband and wife. They had completed their CRNA training approximately twelve years earlier and had been working in small, rural hospitals since completion of their training until their move to Ft. Sanders Anesthesia Group, a short while before the incident in question. Neither had administered anesthesia in a neurosurgical case during their twelve years of experience. Charles Hodges had been working with the Ft. Sanders Group only four weeks when he took over the anesthesia care for plaintiff Mrs. Steele's surgery.

While June Hodges was taking care of Mrs. Steele, Mrs. Steele's blood pressure began to drop; however, it was at an acceptable level when she turned the care over to Charles Hodges. When Charles Hodges took over the care, Mrs. Steele's blood pressure continued to drop. It is the insistence of the plaintiffs that the blood pressure was allowed to remain too low for too long a period of time and that the only action by Charles Hodges that could be interpreted as a form of intervention and response to the dropping blood pressure, was a reduction in the level of the anesthetic. This action failed to result in a timely or adequate blood pressure response in plaintiff Mrs. Steele.

Mr. Hodges failed to institute measures which were indicated and which could have raised Mrs. Steele's blood pressure to safe levels in a matter of five to ten minutes. Mr. Hodges testified he had no recollection of this case and was testifying solely based on the record. He interpreted notations on the chart about when he hung a new bag of i.v. fluid as an additional corrective measure taken. However, the plaintiffs' experts found these measures to have been ineffective. Ms. Bruening performed standard fluid calculations that demonstrated that there was insufficient fluid given for a routine course of anesthesia, much less as a corrective measure. No bolus of fluids was given. Ms. Bruening's calculations were not refuted by defendant, even though the blood pressure readings for Mrs. Steele were low for a prolonged period of time. Mr. Hodges never

---

1. Dr. Mumford, Dr. Jenkins, Dr. Beamer, June Hodges, CRNA, and Charles Hodges, CRNA, are all employees of Ft. Sanders Anesthesia Group and participated in the anesthesia care rendered to plaintiff, Thelmarine Steele.

communicated the drop in blood pressure to Dr. Neblett.

When plaintiff Mrs. Steele awoke from the surgery she was paralyzed from the neck down. Dr. Neblett returned Mrs. Steele to surgery for an emergency operation that night in order to look for a blood clot that may have been pressing on her spinal cord, but found none. Mrs. Steele continued to be essentially paralyzed from the neck down after the surgery and continued to be paralyzed at the date of trial.

In February 1989, Dr. Steven Natelson operated on Mrs. Steele in an attempt to offer some relief. He extended the areas of decompression performed by Dr. Neblett and observed Mrs. Steele's spinal cord. Dr. Natelson's operation had essentially no effect on Mrs. Steele's condition.

In its brief, the defendant depicts the plaintiffs' claims as based on the assertion that the defendant deviated from the standard of care because they failed "to take more heroic measures to raise the blood pressure when it began to drop." The record does not reveal any time that the plaintiffs' experts characterized the deviations by the defendant as a failure to take more heroic measures. We find no evidence in the record where the term "heroic" was used. The standard of care acknowledged by defendant's experts describe very basic requirements for safe anesthesia care.

The proof presented by the plaintiffs through their experts indicated that the defendant, Ft. Sanders Anesthesia Group, deviated from the standard of care by: failing to recognize a special anesthetic risk faced by plaintiff Mrs. Steele; failing to record necessary information regarding the patient's condition on the chart for reference by others as needed in order to recognize and properly evaluate the anesthesia risk by allowing a person with inadequate skill, knowledge, and experience to administer anesthesia to Mrs. Steele; allowing an excessive number of people to participate in Mrs. Steele's care which increased confusion and decreased communication; failing to give adequate fluids during the surgery; and failing to maintain adequate blood pressure, even though the blood pressure could have been easily raised to an acceptable level with prompt treatment.

■ The defendant's first issue on appeal is: "Did the court err when it allowed defendant's expert witness, John Purvis, M.D., to be cross examined under rule 705, Tennessee Rules of Evidence, with questions based upon expert opinions of former co-defendant Dr. John Neblett given in a discovery deposition while he was a defendant in this action?"

■ A trial court is generally given considerable latitude in the admission of evidence in trial and will be reversed only for an abuse of discretion. *Austin v. City of Memphis*, 684 S.W.2d 624, 631 (Tenn.App.1984) (citing *Davis v. Wicker*, 206 Tenn. 403, 333 S.W.2d 921 (1960); *Wagner v. Niven*, 46 Tenn.App. 581, 332 S.W.2d 511 (1959)).

Dr. Purvis, the defendant's expert neurosurgeon, testified that the cause of plaintiff Mrs. Steele's injury was the manipulation of the spinal cord by Dr. Neblett during surgery. Dr. Purvis acknowledged that he had read and considered Dr. Neblett's discovery deposition when forming his opinion. He testified that he read and considered Dr. Neblett's deposition, but did not rely on it. He stated he rejected Dr. Neblett's testimony. The trial court, exercising its discretion, permitted plaintiffs to cross-examine Dr. Purvis using portions of Dr. Neblett's deposition.

We are of the opinion that Dr. Purvis was properly cross-examined. The cross-examination attempted to impeach the expert's credibility, which is acceptable. Dr. Purvis was not present at the surgery and therefore had to rely on the medical records and testimony of Dr. Neblett's deposition for the facts and data upon which he based his opinion. Dr. Purvis chose to disregard Dr. Neblett's diagnosis as the cause of Mrs. Steele's quadriplegia in order to offer his opinion that it was caused by Dr. Neblett's handling of the spinal cord during surgery. Dr. Purvis was asked several times whether he relied on Dr. Neblett's deposition in formulating his own opinion. He answered as follows:

Q And you have also expressed the opinion that a drop in blood pressure did

not even contribute to her [Mrs. Steele's] paralysis; is that right?

A That's correct.

Q In your opinion. Now in formulating your opinion did you take into account and consider that the surgeon who was there, Dr. Neblett, thought that hypotension was the most likely cause of her injury?

A Well, I would disagree with it. I think statistically that would not be the case.

Q You read his deposition?

A I did.

. . . .

Q Dr. Purvis, you read the deposition of Dr. Neblett; didn't you?

A I did.

Q Okay. And in reading that deposition did you consider the testimony that was given on page 40 to the effect that Dr. Neblett was asked about his opinion on potential causes of her bad result, and he stated, "I think she has had ischemic damage to her cervical spinal cord. I think that there is a real possibility that hypoten[s]ion contributed to that. The next question is—

. . . .

Q And then he was asked, "Is the ischemic damage due to hypoten[s]ion the most likely explanation of this woman's present condition?" And he's answered, "Given that she had a negative exploration that evening and no intrinsic pressure was found, my conclusion would be that she had intrinsic damage as a result of ischemia." And then he was asked, "Is that what you're referring to, intrinsic damage? Is that what you're referring to as the ischemia, as a result of hypotension?" And the answer was, "Yes, ma'am." Now did you consider that testimony in formulating your own opinions in this case?

A I considered the testimony. It had little effect on my opinion. I thought that he was wrong. I thought that his basic premise was wrong. You could go back, you could have done an adequate depression and still damage the cord and when you go back in everything could look pret-

ty normal under the circumstances. And I thought that that was not a correct premise, and I did not think—did not change my opinion that this was due to surgical manipulation.

. . . .

Q In formulating your opinions in this case, did you consider the testimony of Dr. Neblett on page 29 of his deposition where he was asked, "Is there any drop in blood pressure recorded on that record?" He answered, "Yes, there is." "Is the drop significant in your estimation for a patient who is having a cervical laminectomy in the upright position?" His answer, "Yes, ma'am." Question, "At what level is that drop in blood pressure significant to you?" He answers, "Looking at this record I see that the anesthesiologist's or anesthetist's notes at the beginning of the procedure, the blood pressure is in the range of 120 to 140 over 80. And then according to the record around 2:15 that afternoon it's 100 over 150. It reaches a low of around 70 over 40 around 3:15, and I would say during that time, in my opinion, from that 2:15 to 3:15, the blood pressure of 90 over 60 to 70 over 40 would be unacceptably low given the fact that Mrs. Steele, the week prior to operation, on the floor ran about 110 to 120 over 80.? Did you read that testimony?

A Yes, I did.

Q Did you consider that testimony in formulating your opinion of this case?

A I considered the testimony. I rejected his premise that the blood pressure in the 90's was detrimental to this patient's cord. I do not believe that to be true.

. . . .

Q Dr. Purvis, did you rely on Dr. Neblett's deposition in formulating your opinions in this case?

A No. No, that wouldn't qualify me as an expert for me just to rely on someone's deposition. This could be self-serving.

Q Well, you weren't there though.

MR. CAGLE: Let him finish.

A No, I was not there, but I had access to the medical records and access to the operative note, which is fairly graphic in

exactly what happened. And I think that I considered it. By reading this, I considered his opinions in wanting to know what his opinions were about the thing. But after reading it, I rejected what I thought his premise was.

Q You read and considered his deposition, you simply just did not agree with what his testimony was?

A That's correct. That's correct.

. . . .

Q Dr. Purvis, why did you read Dr. Neblett's deposition?

A I tried to get all the information I could possibly get about this situation and so I went through—I was frankly somewhat shocked at his opinion that the blood pressure had this effect. And I—that was the main thing that I got out of it.

Q So you considered it?

A I looked at it and I considered it and I thought he was entirely wrong and the premise was wrong. So I wouldn't say that I relied on that in formulating my opinion, but I certainly gave—I looked into everything as I possibly could.

█ We are of the opinion that full cross-examination of an expert can not and should not be curtailed simply by having the expert deny that he relied on any materials he reviewed and considered with which he disagrees.

We have researched Tennessee case law, but have been unable to find a published opinion directly on point. However, in the recently decided opinion *Inderkum v. The Kroger Company*, No. 03A01–9403–CV–00108, 1994 WL 510251 (Tenn.App. 19 Sept. 1994), the court confronted a similar issue. In *Inderkum*, the plaintiff slipped and fell on the premises of a Kroger grocery store. *Inderkum*, No. 03A01–9403–CV–00108, at *1. Plaintiff was examined prior to trial by Dr. Pannell, a Kingsport chiropractor, who testified at trial that he did not "think she suffered an injury at Kroger." *Id.* During cross-examination, Dr. Pannell was asked: "Q. Did you read the letter from Dr. Scariano to Dr. Mendez where he recommended that she get further tests?" *Id.* at *1. Defendant objected to the question, and the

trial court sustained the objection. This court, speaking through Judge Susano, stated the following:

The question is improper on its face. While the Plaintiff clearly had the right under Tenn.R.Evid. 705 to ask Dr. Pannell if he had read the letter from Dr. Scariano to Dr. Mendez, he did not have the right, at least at that juncture, to reveal its contents to the jury. *Cf.* Tenn.R.Evid. 103(c). He was first required to determine if Dr. Pannell had read the letter. This he could have done by identifying the letter by date, addressee and sender, or by showing the letter to Dr. Pannell without announcing "out loud" its contents—that Dr. Scariano had "recommended that she get further tests." If Dr. Pannell had seen the letter, and if its contents were a part of the "facts or data" underlying his opinion or an inference drawn by him, then the Plaintiff could have inquired of him regarding its contents in an attempt to test the validity of Dr. Pannell's opinion testimony. This would have been true even though the letter, in this case, was hearsay and apparently not independently admissible. *See* Tenn. R.Evid. 703 ("If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.") But until the contents of the letter were shown to be a part of the underlying "facts or data," a question *incorporating* the contents was objectionable.

*Id.* at *1 (footnotes omitted).

In the present case, counsel asked Dr. Purvis if he read the deposition before questioning him on it. Furthermore, other jurisdictions have held that it is proper to cross-examine an expert with material of another expert that tends to refute inferences or deductions made by the expert being cross-examined. *Leonardi v. Loyola Univ. of Chicago*, 262 Ill.App.3d 411, 199 Ill.Dec. 13, 633 N.E.2d 809 (1993); *Piano v. Davison*, 157 Ill.App.3d 649, 110 Ill.Dec. 35, 510 N.E.2d 1066 (1987); *Rafter v. Raymark Indus., Inc.*, 429 Pa.Super. 360, 632 A.2d 897 (1993); *Kemp v. Qualls*, 326 Pa.Super. 319, 473 A.2d 1369 (1984). Illinois has specifically held

that a trial court may properly permit cross-examination of an expert concerning reports or depositions of other witnesses, which the expert has read. *Leonardi*, 199 Ill.Dec. at 18, 633 N.E.2d at 814; *Piano*, 110 Ill.Dec. at 51, 510 N.E.2d at 1082. Furthermore, in *Piano* the Illinois court stated: "An expert who has based his opinion on a report, does not have to agree with the entire report." *Piano*, 110 Ill.Dec. at 51, 510 N.E.2d at 1082.

In the present case, Dr. Purvis testified that he had read Dr. Neblett's deposition when formulating his opinion. He further testified that he read the deposition in order to get all of the information he possibly could concerning Mrs. Steele's surgery. We, therefore, find that because Dr. Purvis read and considered the deposition, which he testified to, it was open to cross-examination. We further find that plaintiffs' counsel was attempting to diminish the impact and reliability of Dr. Purvis' opinion, which is proper on cross-examination. *See Kemp v. Qualls*, 473 A.2d at 1371, wherein a Pennsylvania court held that diagnoses by other physicians was evidence such that "would have tended to diminish the impact and reliability" of the expert's opinion and that the records were used only to refute the testifying expert's opinion.

■ An expert may base an opinion on reliable facts or data not admissible in evidence. Tenn.R.Evid. 703. The full text of Rule 703 reads as follows:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn.R.Evid. 703. Rule 705 of the Tennessee Rules of Evidence refers to cross-examination of an expert and reads: "The expert may testify in terms of opinion or inference and give reasons without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts on cross-examination." Tenn.R.Evid. 705.

■ Under our rules of evidence, an expert may simply state an opinion on direct examination, then the cross-examiner may attempt to impeach the expert's testimony. A cross-examiner may require information from the expert that would undermine his or her credibility. It is appropriate for the cross-examiner to focus on the data contained in the information that was supplied to the expert out of court for the expert to read and consider in formulating his opinion. It is well established that wide latitude should be afforded on cross-examination. *State v. Horne*, 652 S.W.2d 916, 918 (Tenn.App.1983). Furthermore, a witness may be cross-examined to show possible prejudice or bias, and this right should be limited only upon a showing of the most extraordinary circumstances. *Phillips v. Pitts*, 602 S.W.2d 246, 249 (Tenn.App.1980).

We are of the opinion that this cross-examination was immaterial, was heard by the jury for a short period in the middle of a two-and-a-half week trial, and was utilized for the purpose of impeachment after a strong cautionary instruction to that effect was given by the trial court. No reference was made to Dr. Neblett's deposition in closing argument by plaintiffs' counsel.

The trial court, in the course of denying defendant's motion for a new trial, noted that if reading portions of Dr. Neblett's deposition during cross-examination of Dr. Purvis was error, then it was harmless since the deposition testimony was cumulative to direct evidence in the record and that stringent, cautionary instructions were given. The trial court also expressed doubts about its prior ruling during the trial that he had prevented plaintiffs from reading Dr. Neblett's deposition in the record as substantive evidence. We are of the opinion that there was no abuse of discretion by the trial court in permitting plaintiffs to cross-examine Dr. Purvis, utilizing all the material she had been supplied with by the defendant and had read

and considered in preparation for giving testimony in this case.

We have considered each of the four cases cited by the defendant from other jurisdictions and have determined that they are distinguishable from the instant case.

■ The defendant also contends that the cross-examination was unfairly prejudicial, despite the trial court's limiting instruction because Dr. Neblett was the operating surgeon. The entire cross-examination of Dr. Purvis took only a short period of time in the middle of a two-and-a-half week trial and was never mentioned again to the jury. We are of the opinion that the deposition testimony of a treating physician, used briefly for impeachment and protected by a limiting instruction, would not likely affect the verdict, and such insistence is unsupported by the facts of this case.

After fully considering this issue, we are of the opinion that it is without merit.

■ Defendant's second issue is: "Did the action of the court in allowing the testimony of expert witness Clark Watts violate the provisions of Tennessee Code Annotated, section 29–26–115(b) because Dr. Watts had practiced in a contiguous state for only two months during the year preceding the injury in this case?"

Dr. Watts is undoubtedly a qualified neurosurgeon.

Tennessee Code Annotated section 29–26–115(b) provides:

(b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a) unless he was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make his expert testimony relevant to the issues in the case and had practiced this profession or specialty in one of these states during the year preceding the date that

the alleged injury or wrongful act occurred....

Tenn.Code Ann. § 29–26–115(b) (1980).

The defendant argues that Dr. Watts was not competent to testify within the meaning of section 29–26–115(b) because he did not practice his specialty in a contiguous state throughout the course of the year preceding plaintiff Mrs. Steele's injuries. Dr. Watts testified that he was from Baltimore, Maryland, but that he had practiced in Columbia, Missouri from January 1976 until January 1, 1991, when he moved to the University of Maryland in Baltimore. In the year preceding the injury (October 28, 1987, until October 28, 1988), Dr. Watts practiced approximately two months in the state of Missouri. Dr. Watts practiced in Missouri from October through December of 1987 and also practiced, although intermittently, in Missouri during 1988. Mrs. Steele's injury occurred on 28 October 1988. On 1 January 1988 Dr. Watts took a sabbatical from his academic setting and worked at the Pentagon in Washington D.C. During the two month period that he practiced in Missouri in the year preceding plaintiff Mrs. Steele's injury, he was enrolled at the University of Missouri Law School and was a law student as well as a practicing physician. After his sabbatical, Dr. Watts returned to Missouri.

Defendant objected to Dr. Watts qualifications on the ground that he was not qualified to testify under the Medical Malpractice Statute. The court overruled the defendant's objections after finding that "nothing in the statute indicates that he had to practice for the entire period of a year in order to learn that local practice and standard of care." Defendant argues that the statute is clear that it was the intent of the legislature that an expert practice in Tennessee or a contiguous state during the preceding year before such an expert would be qualified to testify in a Tennessee malpractice action. Defendant further contends that the word "during" seems to be controlling and that Webster's Dictionary and Black's Law Dictionary give the primary meaning of the word "during" as "throughout the duration of or course of."

It is the defendant's contention that the statute, Tennessee Code Annotated section

29–26–115(b), requires an expert to practice in a contiguous state for the entire year preceding the incident giving rise to the litigation. We are of the opinion that such an interpretation is not warranted by either the letter or the spirit of the statute.

Tennessee Code Annotated section 29–26–115(b) provides: "the court may waive this subsection [b] when it determines that the appropriate witnesses otherwise would not be available." Furthermore, nothing in the statute defines "during."

■ The purpose of statutory interpretation is to ascertain and give effect to the legislative intent. *Anderson v. Outland,* 210 Tenn. 526, 532, 360 S.W.2d 44, 47 (Tenn. 1962). The legislative intent is to be ascertained primarily from the natural and ordinary meaning of the language as used in the context of the entire statute. *Worrall v. The Kroger Co.,* 545 S.W.2d 736 (Tenn.1977). We are of the opinion that the plain meaning of Tennessee Code Annotated section 29–26–115(b) supports the trial court's interpretation.

There is also substantial support to the plaintiffs' theory of the statute from the legislative history. Senator Douglas Henry in May 1975 moved to amend subsection (b). His motion would have stricken the expert qualifications as written and substituted the following:

> No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a) unless he is licensed to practice in his home State a profession or specialty which would make his expert testimony relevant to the issues in the claim and had been actively engaged in such practice in his home state not less than seventy-five percent (75%) of his time during the year preceding the date that the alleged injury or wrongful act occurred.

H. Bill No. 1035, Amend. No. 38, 89th Gen. Assembly, Organizational and 1st Regular Session (19 May 1975), *printed in* Senate Journal 946, 950.

This amendment was not adopted. We think that by failing to adopt this amendment it is clear that the legislature did not wish to define "during the preceding year" as some quantitative percentage of time and instead was content to leave "during" to mean "at some time during the preceding year." We have found no Tennessee case, and defendant has cited none, that supports defendant's position on this issue. Defendant relies wholly on selected definitions of the word "during" found in Webster's Dictionary and Black's Law Dictionary. Both of these authorities also support the plaintiffs' construction of the statute.

*Webster's II New Riverside University Dictionary* 411 (1984) defines "during" as: 1. Throughout the course or duration of (talked all *during* the movie) 2. At some time in (died *during* the night). The definitions from Webster's for the term "during" support plaintiffs' construction of the statute.

Also, *Black's Law Dictionary* 504 (6th ed.1990) defines "during" as "Throughout the course of, throughout the continuance of; in the time of; after the commencement and before the expiration of." This definition supports the plaintiffs' contention. Even if defendant's interpretation of the statute was accepted and the trial court's interpretation found to be in error, any error associated with Dr. Watts' testimony on proximate cause would be harmless since his testimony regarding causation was cumulative. While the defendant contends that Dr. Watts was plaintiffs' sole witness as to the proximate cause of Mrs. Steele's injury, the record does not support this contention. Dr. Vinik, a board certified anesthesiologist, testified specifically that the deviation in the standard of care that allowed the blood pressure to remain too low for too long was the proximate cause of plaintiff Mrs. Steele's injury. Even if Dr. Watts' testimony was to be excluded, there is still ample material evidence to support the jury's verdict.

■ Defendant also contends that the trial court committed error in admitting the testimony of Joan Bruening, CRNA. Ms. Bruening practiced for most of her career in Kansas City, Missouri. The year before Mrs. Steele's injury occurred, Ms. Bruening

was practicing in Florida. While practicing in Florida, she worked with three other CRNA's, all of whom had received their training in Tennessee, and she attended a Continuing Medical Education meeting in Tennessee. The tests for certification as a CRNA are national tests, and there are no state licensure or state examinations for the practice of nurse anesthesia.

Defendant moved for a motion in limine to prevent Mrs. Bruening from testifying as an expert witness. Plaintiffs moved for a waiver pursuant to Tennessee Code Annotated section 29–26–115(b) and submitted affidavits to demonstrate the difficulty encountered in attempting to find a CRNA expert to testify. The trial judge, in exercising his discretion, granted the waiver after the hearing. Following the grant of the waiver, the defendant requested and obtained a continuance in order to obtain its own nurse anesthetist expert. However, defendant did not call a nurse anesthetist as an expert and at trial, called only Charles Hodges to testify as a CRNA expert.

The constitutionality of this statute was affirmed in *Sutphin v. Platt*, 720 S.W.2d 455 (Tenn.1986) based in part on the presence of the waiver provision being a "safety valve" for situations in which the party is unable to locate a qualified expert within the state or one of our bordering states. *Id.* at 458. In *Pyle v. Morrison*, 716 S.W.2d 930 (Tenn.App. 1986), this court affirmed the trial court's grant of a waiver for an expert from a non-contiguous state, on the basis that plaintiff's counsel's affidavit stated, after diligent search and inquiry, he was able to find only one witness within a contiguous state. *Id.* at 933.

We have found no case where the grant of a waiver has been held to be an abuse of discretion. However, in *Childress v. Bennett*, 816 S.W.2d 314 (Tenn.1991), the failure to grant a waiver was held an abuse of discretion. In *Childress*, protracted litigation occurred over a period of some ten years. The witness proposed by plaintiff was an expert who otherwise met the statutory requirements, except that he had been absent from a contiguous state for the year prior to the event. *Id.* at 316. While there

is nothing in the opinion that sets forth any facts regarding the plaintiff's attorney's efforts to find an expert, the court stated that if the expert who did not meet the statute was the only one the plaintiffs could find in over ten years of litigation, then, apparently an expert was otherwise not available. *Id.* at 315. *See also Crumley v. Memorial Hosp., Inc.*, 509 F.Supp. 531, 533 (E.D.Tenn.1978).

In the instant case, the affidavits submitted demonstrate that reasonable diligence was exercised to find a witness who met the criteria of the statute. We find no abuse of discretion by the trial court in granting the waiver. This issue is without merit.

■ Defendant's third issue is: "Did the court err when it failed to strike the evidence proving incurred medical expenses and future medical expenses of Thelmarine Steele since those expenses were/will be paid by the health insurance provided by the employer of plaintiffs and the proof of such expenses is barred by Tennessee Code Annotated, section 29–26–119?"

At the time of trial, plaintiff Mrs. Steele's medical expenses were $500,809.90. From discovery depositions, defendant was made aware that these expenses had been partly paid by health insurance from both Mr. Steele and Mrs. Steele which was obtained through their employment and that both of the Steeles paid a portion of the premiums on their policies. Plaintiffs' expert economist testified that a health plan at Martin Marietta was part of Thelmarine Steele's earnings. The defendant moved, after the close of evidence, to strike the stipulated damages on grounds that Dr. Bohr had testified that these expenses were paid by insurance provided by Mrs. Steele's employer. The trial court allowed the reopening of the proof for the purpose of questioning Mr. Steele regarding whether or not the Steeles paid part of their insurance premium. This was within the discretion of the trial court even though the proof had been closed. *Simpson v. Frontier Community Credit Union*, 810 S.W.2d 147, 149 (Tenn.1991). Following Mr. Steele's testimony, the trial court found that a portion of the insurance premiums were paid by plaintiffs. The trial judge then ruled that Tennessee Code Annotated section 29–

26–119 did not apply since portions of the insurance were paid for by plaintiffs.

Defendant contends that Tennessee Code Annotated section 29–26–119 should be construed to prohibit introduction of medical expenses that were covered by insurance purchased in part by an employer. Defendant argues in the alternative that, at most, only a prorated introduction of these costs, based on the amount of premiums paid by the employer or employee, should be allowed.

Tennessee Code Annotated section 29–26–119 provides that medical expenses are included as recoverable damages in a medical malpractice claim:

> [O]nly to the extent that such costs are not paid or payable and such losses are not replaced, or indemnified in whole or in part, by insurance provided by an employer either governmental or private, by social security benefits, service benefit programs, unemployment benefits, or any other source except the assets of the claimants or of members of the claimants' immediate family and insurance purchased in whole or in part, privately and individually.

Tenn.Code Ann. § 29–26–119 (1980).

The plain language of the act clearly permits a plaintiff to introduce medical expenses when the plaintiff has paid part of the insurance premium.

The defendant's interpretation of the statute looks only to the exclusion of losses replaced "by insurance provided by an employer," without regard to the exception for "insurance purchased in whole or in part" by the plaintiff, and such interpretation is not plausible.

 The collateral source rule permits plaintiffs to prove and recover medical expenses, whether paid by insurance or not. *Donnell v. Donnell*, 220 Tenn. 169, 415 S.W.2d 127, 134 (1967). Tennessee Code Annotated section 29–26–119 is in derogation of the common law and is therefore to be strictly construed. *Austin v. County of Shelby*, 640 S.W.2d 852, 854 (Tenn.App.1982) (citing *Olsen v. Sharpe*, 191 Tenn. 503, 235 S.W.2d 11 (1950)). The common law may not be altered any further by statute than the statute expressly declares and necessity requires. *Davenport v. Chrysler Credit Corp.*, 818 S.W.2d 23, 28 (Tenn.App.1991) (citing *In re Deskins' Estates*, 214 Tenn. 608, 611, 381 S.W.2d 921, 922 (1964); *Linder v. Metropolitan Life Ins. Co.*, 148 Tenn. 236, 243–44, 255 S.W. 43, 45 (1923)).

Support for the trial court's construction of Tennessee Code Annotated section 29–26–119 is found in the legislative history. The original text of the act which became Tennessee Code Annotated section 29–26–119, in section 18, contained the words: "By insurance, or governmental employment or service benefit programs or from any other source except the assets of the claimants or the members of the claimant's immediate family." An amendment was proposed to strike the preceding language and insert the following: "By insurance provided by an employer, either governmental or private, by Social Security benefits, service benefit programs, unemployment benefits, or any other source except the assets of claimant or the members of the claimant's immediate family and insurance purchased in whole or in part, privately and individually."

This amendment was proposed in the senate by Senator Edward Blank on Monday, 12 May 1975. The amendments were adopted and formed the present text of Tennessee Code Annotated section 29–26–119. Discussing the reason for the amendment, which was subsequently adopted, Senator Davis stated:

> Now, the next Amendment ... [that includes the exception for insurance purchased privately] ... we believe that it would be better to exclude some of these benefits that a person already can claim under unemployment or some other benefits, but if he pays part or partially for some of these benefits, for disability and otherwise, then he should be allowed to collect those, and that not be deducted from the settlement.

H. Bill No. 1035, Tape Transcript, Tape S–116 (12 May 1975) (quoting Sen. Davis).

We are of the opinion from the legislative history that it is expressly intended that benefits paid by insurance partially purchased by an employee should not be excluded.

We find no merit in this issue.

■ Defendant's fourth issue is: "Was the verdict of the jury in excess of the upper limits of the range of reasonableness so as to require the court to grant a new trial?"

The trial court in this case suggested a remittitur in the amount of $800,000.00 from the verdict in favor of Mr. Steele in the amount of $2,000,000.00. The remittitur suggested by the court was accepted, under protest, by the plaintiffs.

It is defendant's contention that the amount of the verdict in favor of Mr. Steele for loss of consortium was, on its face, beyond the upper limits of the range of reasonableness and that a new trial should have been granted, rather than the $800,000.00 remittitur.

The defendant acknowledged and the record fully supports that Mr. Steele has suffered substantial damages as a result of his wife's quadriplegia.

The defendant contends that this court should remand the case for new trial because the verdict for loss of consortium was grossly in excess of the upper limits of reasonableness so as to require a new trial. However, the plaintiffs contend that not only is a new trial unwarranted but that the court should restore the verdict returned by the jury.

Defendant's main contention on appeal is that because of the size of the verdict relative to other cases, the jury must have been influenced by passion and prejudice with regard to Mr. Steele. We do not believe that the case law, as cited by the defendant, supports its contention. In *Pitts v. Exxon Corp.*, 596 S.W.2d 830 (Tenn.1980), the court set forth the standards of finding whether an award is a result of passion, prejudice, or caprice and concluded:

> It is inevitable therefore that the validity of a finding that a jury verdict evidences passion, prejudice or caprice from the size alone is always suspect and with justification could be characterized as an arbitrary basis for the imposition upon the parties and the judicial system of a new trial. *Id.* at 836.

The verdict in the case of Mr. Steele is large; however, there is precedent from other jurisdictions for upholding loss of consortium awards in the range awarded to Mr. Steele, as well as in similar ratios recovered between the primary claim and the consortium claim. *See, e.g., Holston v. Sisters of the Third Order of St. Francis*, 247 Ill. App.3d 985, 187 Ill.Dec. 743, 747, 618 N.E.2d 334, 348 (1993), where a $1.2 million loss of consortium award to decedent's husband was affirmed on appeal. The total recovery to decedent's husband and children was $7.3 million, which was affirmed.

Defendant cites *Guess v. Maury*, 726 S.W.2d 906 (Tenn.App.1986), a case in which a 75% remittitur was granted, as an example of a case in which the remittitur destroyed the jury's verdict. Defendant then points out that the remittitur suggested in the instant case constitutes a 40% reduction, arguing that the numbers themselves were significant. In *Jenkins v. Commodore Corp. Southern*, 584 S.W.2d 773 (Tenn.1979), the plaintiffs' two year old son was killed in a fire, and the jury returned a verdict of $250,-000.00. *Id.* at 775. The trial judge approved the verdict on liability, but suggested a remittitur of one hundred thousand dollars, which was accepted by the plaintiffs. *Id.* This court found the verdict shockingly excessive, concluded that the award was the result of passion, prejudice, or caprice, held the verdict to be a nullity, and ordered a new trial on all issues. *Id.* at 776. However, on appeal, the Supreme Court reversed this court and ordered the initial verdict reinstated. The court felt the verdict was excessive but one which could properly be corrected by the use of the broad powers of the trial and appellate courts of remittitur. *Id.* at 778. The size of the remittitur was held by the court not to be the basis for a new trial. The size of the remittitur was 40%, the exact size of the remittitur of Mr. Steele's consortium claim.

It was correctly put to the jury to place a value on Mr. Steele's loss of consortium, because the amount of the verdict is primarily for the jury to determine. *Burlison v. Rose*, 701 S.W.2d 609, 611 (Tenn.1985).

The defendant also relies on *Smith v. Shelton*, 569 S.W.2d 421 (Tenn.1978), which states

the test long used to determine whether the jury's verdict should stand. The court stated:

> If it is determined that the jury's verdict is within the range of reasonableness or that both the jury's and the trial judge's awards are within that range, the appellate court must restore the jury verdict. If only the trial judge's award is within the range, it must be affirmed. If neither are within the range of reasonableness, the Court of Appeals should make appropriate use of remittitur and render judgment within the range of reasonableness based upon the credible proof of damages.

*Id.* at 427. As this court stated in *Guess,* "*Foster v. Amcon International, Inc.,* 621 S.W.2d 142 (Tenn.1981) clarifies and at the same time modifies the guidelines of *Shelton.*" *Guess,* 726 S.W.2d at 912. This court then stated the standard of review as enunciated in *Foster* as follows:

> Henceforth the standard of appellate review will be simply to ascertain whether the trial judge's actions in increasing or decreasing a verdict were justified, giving due credit to the jury's decision on the credibility of the witnesses and that of the trial judge in his capacity as thirteenth juror.

*Id.* (quoting *Foster v. Amcon Int'l, Inc.,* 621 S.W.2d 142, 145 (Tenn.1981)).

The proof of damages presented in the trial of this case supports a substantial loss of consortium suffered by Tommy Steele, and we are of the opinion that the award of the trial judge is within the range of reasonableness. This issue is without merit.

We have considered the issue raised by the plaintiffs of whether or not this court should restore the jury's verdict or the trial court erred in granting the remittitur.

We are of the opinion that the trial judge's suggestion of remittitur is within the range of reasonableness and that there was no error.

It results that the judgment of the trial court is, in all respects, affirmed, and the cause is remanded to the trial court for the enforcement of its judgment, the collection of costs, and for any further necessary proceedings. Costs on appeal are taxed to the defendant, Ft. Sanders Anesthesia Group.

McMURRAY and SUSANO, JJ., concur.