IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 24, 2018 Session

## STATE OF TENNESSEE v. TIMOTHY PATE

**Appeal from the Criminal Court for Carter County**
**No. 21543A       Stacy L. Street, Judge**

_____

### No. E2016-02566-CCA-R3-CD

_____

The Defendant, Timothy Pate, was convicted by a jury of first degree premeditated murder, first degree felony murder, tampering with evidence, and abuse of a corpse. See Tenn. Code Ann. §§ 39-13-202, -16-503, -17-312. The trial court merged the two first degree murder convictions and imposed a total effective sentence of life imprisonment. On appeal, the Defendant contends that he was denied his right to a fair trial by an impartial jury because a written juror question demonstrated that one of the jurors had "a decided prejudice and bias" against the Defendant. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Donald E. Spurrell, Johnson City, Tennessee, for the appellant, Timothy Pate.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Anthony Wade Clark, District Attorney General; and Janet Vest Hardin and Dennis Dwayne Brooks, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTUAL BACKGROUND

### I. State's Proof

On the evening of April 17, 2012, the seventy-eight-year-old victim, Lonnie Townsend, was reported missing by his nephew, David Little. The victim lived alone in

Johnson City. The victim's son asked Mr. Little to check on the victim when he was unable to contact the victim. The last activity on the victim's cell phone occurred around 5:30 p.m. that afternoon. Mr. Little testified that the victim's truck was not at the victim's house. Inside, Mr. Little could tell that the victim's dogs had not been fed or taken outside recently. Mr. Little then called the police and reported the victim as missing. Mr. Little testified that the victim kept valuables at his house such as guns, coins, and money but that he "usually carried his money."

Robert Bennett, an employee at the South Roan Service Center, testified that he saw the victim twice on April 17, 2012. Mr. Bennett explained that the South Roan Service Center was "a mechanic shop" and that the victim "hung around [the shop] all the time." Mr. Bennett recalled that the victim came to the shop by himself that morning. According to Mr. Bennett, the victim had a habit of pulling out his wallet and bragging about how much money he had. Mr. Bennett testified that the victim took out his wallet that morning and said that he had a $900 bill to pay later that day. Mr. Bennett further testified that it looked like the victim had more than $900 in his wallet that morning.

Mr. Bennett saw the victim again that afternoon. Mr. Bennett testified that the victim and the Defendant arrived at the shop at the same time in different vehicles. Mr. Bennett explained that the Defendant had been a mechanic at the shop but quit coming to work around April 12, 2012. According to Mr. Bennett, the victim "was trying to talk [them] into giving [the Defendant] his job back." Mr. Bennett explained that the victim and the Defendant were friends. Mr. Bennett further explained that the Defendant's girlfriend and co-defendant, Whitney Harris, had a baby shortly before the Defendant quit coming to work and that "[t]hey didn't have [any]thing" for the baby.

However, the owner of the shop declined to give the Defendant his job back. According to Mr. Bennett, the Defendant had been a good employee for several years, but the Defendant's performance at work significantly declined prior to his quitting. Mr. Bennett believed that the Defendant "was on something" and testified that there was talk around the shop that the Defendant was using "bath salts"[1] and K2, a synthetic cannabinoid. Mr. Bennett recalled that the Defendant and the victim left at the same time and that there was nothing unusual about their behavior that afternoon. Mr. Bennett testified that this was the last time he saw the victim.

Several of the Defendant's neighbors saw the victim park his truck and enter the Defendant's trailer, located in Carter County, on April 17, 2012. This was not unusual, as the victim had previously been to the Defendant's trailer "multiple times." However,

---

[1] "Bath salts" are a synthetic cathinone that "can mimic the effects of cocaine, LSD, and methamphetamine." Jake Schaller, Note, Not For Bathing: Bath Salts and the New Menace of Synthetic Drugs, 16 J. Health Care L. & Pol'y 245, 245-49 (2013).

none of the Defendant's neighbors ever saw the victim leave the Defendant's trailer that day. The Defendant was seen driving the victim's truck the next day. After the Defendant drove off in the victim's truck, his neighbors never saw it again.

Around the same time, Eric Banner saw the Defendant park the victim's truck in front of the Defendant's mother's trailer. Mr. Banner testified that the Defendant "was wild" and incoherently "rambling." Mr. Banner believed that the Defendant was "on something." Mr. Banner approached the Defendant because the Defendant had previously been evicted from this particular trailer park and was not supposed to be on the property. According to Mr. Banner, the Defendant swore at him, "came at [him] . . . with a wrench," and said that he was "going to kill" Mr. Banner.

Shortly after this incident, the Defendant drove the victim's truck to the home of his friend, Harold Gosnell, in Unicoi County. The Defendant asked Mr. Gosnell if he could leave the truck there "for a day or two." Mr. Gosnell estimated that the victim's truck was at his house for a week and a half. A few days after leaving the truck, the Defendant called Mr. Gosnell and asked him to remove the truck's license plate. The Defendant then came by and put another license plate on the truck. Mr. Gosnell contacted the police after he learned that the truck belonged to the victim, and the police seized the truck.

Around the time the Defendant left the victim's truck at Mr. Gosnell's residence, the Defendant's neighbors observed "a lot of frenz[ied] activity" at the Defendant's trailer. It appeared that "they were packing up stuff . . . in a complete rush to get out." The Defendant, co-defendant Harris, and their two children then spent the night at the apartment of the Defendant's ex-wife, Jennifer Pate. Ms. Pate testified that prior to this, the Defendant had asked her to take care of his children because "he couldn't take care of them." Around the time that Defendant and his family spent the night at her apartment, the Defendant asked Ms. Pate to borrow her truck so he could get rid of a section of his couch. The Defendant claimed that his brother had urinated on that section of the couch.

The Defendant then told several people that he was going to Florida to look for work. Prior to leaving, the Defendant was having trouble paying his rent. This, coupled with the fact that the Defendant's trailer appeared to be abandoned, caused his landlord and her daughter, Deborah Grindstaff, to check on the trailer on April 26, 2012. Ms. Grindstaff testified that a section of the Defendant's couch was sitting outside the trailer. Ms. Grindstaff and the landlord found the door to the trailer open. Ms. Grindstaff recalled that the "house was a wreck on the inside." Ms. Grindstaff found the carpet missing from one of the bedrooms. Ms. Grindstaff also saw what she thought was blood on the floor and called the police.

At this point, the police had determined that the Defendant and co-defendant Harris were friends of the victim and that the Defendant was the last person to be seen with the victim. The police contacted Ms. Pate looking for the Defendant. Ms. Pate informed the police that the Defendant had been calling her while he was in Florida and asking her to send him money. Eventually, the Defendant told Ms. Pate that he was coming to her workplace to get money from her. Ms. Pate passed this information on to the police. The Defendant and co-defendant Harris were arrested in the parking lot of Ms. Pate's workplace on May 4, 2012.

Co-defendant Harris "seemed cooperative" to the investigators, although she "looked worn down" and, at times, got upset while being held in the interview room. Co-defendant Harris told the investigators that the Defendant killed the victim with a hammer. Co-defendant Harris stated that she did not see the Defendant kill the victim but that she had been sitting on the couch next to the victim holding her baby when she heard the first hit. She continued, stating that she ran with the baby to a bedroom where she heard the Defendant hit the victim three or four more times.

Co-defendant Harris then led the investigators to the victim's remains. They were found in a secluded area of Unicoi County between a cabin and an abandoned trailer on Spivey Mountain. The investigators found a roll of carpet and floor padding. When they unrolled it, they discovered the victim's "skeletal remains" and "insect and maggot activity . . . along with some clothing items." The victim's "head and neck area [were] pulled out from . . . the carpet" suggesting "animal activity had occurred with the body." Co-defendant Harris then led the police to an area where she claimed that the Defendant had disposed of two hammers. The Defendant would subsequently tell the investigators that the murder weapon was located near where co-defendant Harris had taken the investigators on May 4, 2012. However, the murder weapon was never recovered.

An autopsy was performed on the victim's remains, and they were examined by a forensic anthropologist from the University of Tennessee. The victim's manner of death was homicide, and the cause of death was "multiple blunt force injuries [to the] head." The injuries were caused by "the claw-like end of a hammer type instrument." Each of the blows caused radiating fractures. Two of the three blows completely penetrated the skull. It was impossible to determine if the victim's skull had been struck more than three times because some of the blows had dislodged portions of the skull. The victim's body had been exposed to wildlife after his death. This was evidenced by the fact that some of the bones were missing and there were "[s]ome tooth marks" on other bones.

The police searched the Defendant's trailer twice, along with the Defendant's car, and the victim's truck. The inside of the trailer was described as being "just in disarray." Police took samples of the carpet. Subsequent forensic testing by the Tennessee Bureau of Investigation (TBI) concluded that the carpet fibers taken from the Defendant's trailer

-4-

were consistent with fibers from the carpet in which the victim's remains were rolled up. The investigators also took samples from stains believed to be blood. Specifically, the investigators found what was believed to be blood on the counter and bar behind the couch, the carpet in front of the couch, and on the floor of the bedroom where the carpet had been removed. The investigators also seized the section of the couch found outside the trailer and located three areas they believed to be blood stains. However, subsequent forensic testing by the TBI was inconclusive for all of these samples.

The investigators found the license plate to the victim's truck in the front seat of the truck. Additionally, a pair of latex gloves was found in the carpet along with the victim's remains. Subsequent forensic testing by the TBI recovered a partial DNA profile from one of the gloves, and the Defendant could not be excluded as the contributor of the DNA. Receipts found in the Defendant's car established that the Defendant and his family had stayed in a motel in Johnson City on April 22, 2012, and that they were in Florida by April 25, 2012.

Co-defendant Harris's mother, Kristi Harris, testified that, prior to April 2012, she was homeless and unemployed because she had "a mental disability." However, she began staying with the Defendant and co-defendant Harris around the time their baby was born. Ms. Harris recalled that the victim was a friend of the Defendant and co-defendant Harris and that he would do things for them like buy diapers and help with maintenance to their trailer. Ms. Harris also recalled that the Defendant would tell co-defendant Harris to go to the victim's house and ask him for money.

Ms. Harris testified that, on April 17, 2012, the Defendant told her to take co-defendant Harris's car and leave the trailer. According to Ms. Harris, the Defendant was insistent that she leave. Ms. Harris believed that it was after dark when she left the trailer. Ms. Harris testified that she received several phone calls and text messages from co-defendant Harris while she was gone urging her not to come back to the trailer. When she eventually returned, the victim's truck and a section of the couch were outside the trailer. According to Ms. Harris, the Defendant told her that the victim had gotten drunk, and he took him home. Ms. Harris testified that the Defendant also told her that the couch was outside because his brother had urinated on it.

Ms. Harris further testified that she smelled bleach and that there was a baby gate blocking the hallway in front of one of the bedrooms when she returned to the trailer. According to Ms. Harris, the Defendant told her, "[I]f you cross this gate[,] I will kill you. I've killed one man in my life[,] and I'll kill you." However, Ms. Harris claimed that she did not take this threat seriously because the Defendant "always threatened to kill" her. Ms. Harris testified that the Defendant then instructed her to stay in his bedroom with the children.

Ms. Harris recalled that around 3:00 or 4:00 a.m., the Defendant told her that she could come out of the bedroom. According to Ms. Harris, the Defendant showed her the bedroom that had previously been blocked by the baby gate and told her that they wanted to surprise her by preparing that bedroom for her. Ms. Harris explained that she had been sleeping on the couch in the living room while she stayed with the Defendant and co-defendant Harris. Ms. Harris testified that there was nothing in the bedroom and "the carpet was tore up" when the Defendant showed it to her that morning. Ms. Harris also testified that the victim's truck was gone when she woke up the next day. Ms. Harris identified the license plate that the Defendant had placed on the victim's truck as having been from her car.

Ms. Harris testified that she went to Florida with the Defendant, co-defendant Harris, and their children. Ms. Harris claimed that the trip to Florida "was something that just suddenly came up like . . . a couple of days after" April 17, 2012. Ms. Harris explained that they went to Florida because the Defendant "wanted to get away from" Tennessee. While in Florida, the Defendant paid for their motel room with money he said he had received from his aunt. Ms. Harris testified that the Defendant and co-defendant Harris abandoned her in Florida, leaving her at the motel while they drove back to Tennessee.

Ms. Harris denied participating in the victim's murder or helping to dispose of his body. Ms. Harris claimed that she did not see any hammers or blood in the trailer when she returned on the night of the murder. Ms. Harris insisted that her testimony was the truth and that she would not lie to protect co-defendant Harris.

Co-defendant Harris testified that on April 17, 2012, she was the Defendant's girlfriend and the mother of two of his children, a twenty-one-month-old toddler and a ten-day-old baby. Co-defendant Harris recalled that she met the Defendant when a friend took her to the Defendant's home "to party." Co-defendant Harris moved in with the Defendant shortly thereafter because she "didn't have anywhere to go." Co-defendant Harris was eighteen years old, and the Defendant was forty when they met. She was twenty-one at the time of the murder.

Co-defendant Harris testified that she had never known the Defendant to be "aggressive towards anybody" besides her. Co-defendant Harris explained that the Defendant had been violent with her in the past when she "tried to leave him." Co-defendant Harris claimed that the Defendant had slapped, pushed, choked, and raped her on one occasion. Co-defendant Harris also claimed that the Defendant had grabbed her by her hair, pushed her down, and raped her in front of their oldest child while she

was pregnant with their second child. Co-defendant Harris conceded that she did not report any of these incidents to the police.[2]

Co-defendant Harris admitted that she "was a drug addict" because that was "how [she] coped in life." Co-defendant Harris further admitted that she abused alcohol, pills, synthetic cannabinoids, and "bath salts." She also admitted to using synthetic cannabinoids and pills "occasionally" while she was pregnant with her baby. Co-defendant Harris testified that the Defendant "was a drug addict like" her, that he used "bath salts" and synthetic cannabinoids, and that he would get drugs for her to use.

Co-defendant Harris testified that, around the time of the murder, the Defendant was "stressed" because he had just lost his job, and they had a newborn. Co-defendant Harris claimed that the Defendant told her he was accused of stealing from his employer and was fired. Co-defendant Harris testified that, at the time of the murder, they had no money and were behind on their rent and utilities. According to co-defendant Harris, she and the Defendant spent all the money they had on drugs and items for their children. Co-defendant Harris testified that the Defendant was "not paying attention to his children" or helping to take care of them during this time.

Co-defendant Harris testified that Ms. Harris had been staying at their trailer for a few weeks prior to the murder. Co-defendant Harris recalled that her mother had left around noon on April 17, 2012. Co-defendant Harris believed that the Defendant did not leave their trailer that day. Co-defendant Harris testified that she saw the Defendant smoke either synthetic cannabinoids or "bath salts" that afternoon. According to co-defendant Harris, the Defendant then told her that he was going to call the victim, invite him over to their trailer, and kill him for his money.

Co-defendant Harris testified that she did not believe that the Defendant would kill the victim. Co-defendant Harris recalled that she told the Defendant that he "was f--king stupid," that she "didn't want to hear anything like that," and that he should think about their family. Co-defendant Harris explained that she and the Defendant had a good relationship with the victim. The victim had given them money, taken her to doctor's appointments while she was pregnant, and bought gifts for their oldest child. According to co-defendant Harris, the victim had gone to the Defendant's employer a few days before the murder and "spoke up for" the Defendant.

Co-defendant Harris testified that the Defendant told her to sit on the couch with their baby "to distract" the victim when he got to their trailer. Co-defendant Harris reiterated that she did not believe that the Defendant would kill the victim, but she did as

---

[2] This testimony was presented during the State's rebuttal after the Defendant had testified that he had never hit co-defendant Harris.

she was told because she "always [did] what [the Defendant] said." Co-defendant Harris recalled that their oldest child was asleep in her bedroom. Co-defendant Harris estimated that the victim arrived at their trailer around 7:30 p.m.

Co-defendant Harris testified that the victim came inside and sat down beside her on the couch to see the baby. The Defendant walked behind the victim. Co-defendant Harris had seen a hammer in the living room earlier that day. She testified that she did not see what happened next, but she "heard the first hit." After a few seconds, she got up and ran with the baby to the oldest child's bedroom. Co-defendant Harris testified that once they were in the bedroom, she "kept hearing the sound, about three times." According to co-defendant Harris, she then heard the Defendant say that "the son of a b---h won't die," followed by another hit.

Co-defendant Harris testified that she laid the baby down and went back to the living room. According to co-defendant Harris, "[t]here was blood everywhere," and the Defendant said, "I'm sorry, Lonnie, I had to do this." According to co-defendant Harris, the Defendant then pulled the victim's wallet out and took $500 from it. The Defendant "put several trash bags over [the victim's] head and he wrapped them really tight." The Defendant picked up the victim's body underneath the arms and dragged it to a spare bedroom. Co-defendant Harris testified that the Defendant put a jacket underneath the victim's head once he realized "blood was getting all over the carpet" and shut the bedroom door.

Co-defendant Harris claimed that she was "upset" and "shaking" as she watched this. Co-defendant Harris testified that she did not try to help the victim because the Defendant "had threatened to kill [her] if [she] tried to leave, if [she] tried to go to the law, [or] if [she] tried to cross him in any way." According to co-defendant Harris, the Defendant told her to call Ms. Harris and keep her out of the trailer for the next few hours.

The Defendant then told her that they needed to clean the blood off of the counter behind where the victim had been sitting. Co-defendant Harris testified that she got bleach and cleaned "the counter and the wall the best [she] could behind the couch." Co-defendant Harris recalled that most of the blood was on the couch. The Defendant told her that they were going to move the section of the couch the victim had been sitting on outside so that the rain would wash the blood out. Co-defendant Harris testified that she put the bloody hammer in the sink with some water and bleach.

According to co-defendant Harris, Ms. Harris returned later that night and was very intoxicated. Co-defendant Harris testified that the Defendant threatened to kill Ms. Harris if she crossed the baby gate blocking the bedroom where the victim's body was and that he told Ms. Harris that they were remodeling that bedroom for her.

Co-defendant Harris believed that Ms. Harris "had no idea" that there was a body in the trailer and claimed that she never spoke to Ms. Harris about what had happened.

Co-defendant Harris testified that the Defendant cut the carpet out of the bedroom after Ms. Harris had returned to the trailer. Early the next morning, co-defendant Harris helped the Defendant drag the victim's body out the front door and into the bed of the victim's truck. Co-defendant Harris explained that she continued to help the Defendant because she was afraid for herself, her children, and Ms. Harris, and she "didn't want to make [the Defendant] mad, not after what he had just done."

According to co-defendant Harris, the Defendant drove the victim's truck to Spivey Mountain. Co-defendant Harris explained that the Defendant had "lived up there" before and they were "familiar with the area." Co-defendant Harris testified that the Defendant instructed her to meet him halfway down the mountain. Afterwards, they left the victim's truck at the Defendant's mother's trailer and then went and bought some cleaning supplies. Co-defendant Harris testified that she took bleach and scrubbed the blood stain left on the bedroom floor from the victim's body. At some point, the Defendant disposed of the murder weapon.

Co-defendant Harris testified that they spent that night at Ms. Pate's apartment. The next day, she and the Defendant went back to their trailer and packed some items. They spent that night at a motel in Johnson City. According to co-defendant Harris, it was the Defendant's idea to go to Florida. Co-defendant Harris explained that the Defendant wanted to "stay down there for a while until things cooled down . . . in Tennessee." They then went back to the trailer, got a few more things, and left the trailer "destroyed." Co-defendant Harris testified that the Defendant went to his aunt and told her that he was moving to Florida to find work and that she gave him enough money to get down there. They told Ms. Harris that they were going to Florida for a vacation.

Co-defendant Harris was shown a series of photographs that were taken while she, the Defendant, their children, and Ms. Harris were in Florida. Co-defendant Harris acknowledged that they looked like they were enjoying their trip to the beach. However, co-defendant Harris explained that she "was trying to do anything just to make [the Defendant] happy and not have anything happen to [her]self, [her] kids, [or her] mother." Co-defendant Harris testified that the Defendant decided to come back to Tennessee and to leave Ms. Harris behind in Florida. So they and their children drove back with a homeless man they had met at their motel.

Co-defendant Harris testified that the Defendant did not seem concerned about being arrested. Co-defendant Harris claimed that the Defendant told her that he was going to get some money from Ms. Pate and then kill someone else in order to get more money and some guns. Co-defendant Harris further claimed that the Defendant said that

"he wanted to become a serial killer." However, they were arrested when they got to Ms. Pate's workplace.

Co-defendant Harris testified that she gave a statement to the investigators because she felt "safe" and "wanted to do the right thing." Co-defendant Harris led the investigators to the victim's body, attempted to help them locate the murder weapon, and consented to a search of the trailer. Co-defendant Harris told one of the investigators that the Defendant had told her how he was going to kill the victim. Co-defendant Harris reiterated that she did not see the Defendant kill the victim, but she admitted that she demonstrated how the Defendant swung the hammer for the investigators.

Co-defendant Harris also admitted that when she was left alone in the interview room, she stated, "I can't believe this. . . . I thought I was gonna get away with it. I just f--ked myself. God dammit!" However, co-defendant Harris claimed that this was not a confession that she had killed the victim. Co-defendant Harris explained that she was upset because she had told the police about her "participation in the crime."

Co-defendant Harris admitted that she was charged with first degree premeditated murder, first degree felony murder, and tampering with evidence. However, co-defendant Harris had received a plea offer from the State in which she would plead guilty to being an accessory after the fact and tampering with evidence and receive a ten-year sentence in exchange for testifying "truthfully." Co-defendant Harris denied that she killed the victim. Co-defendant Harris further denied that she helped to plan the killing or their trip to Florida. Co-defendant Harris contended that these were all the Defendant's ideas. Co-defendant Harris insisted that she had testified truthfully "because it [was] the truth" and not because it helped her.

Co-defendant Harris admitted that she had a lengthy history of mental health issues and criminal activity. Co-defendant Harris testified that she was involuntarily committed at thirteen after an altercation with Ms. Harris when she pointed a knife at Ms. Harris and cut herself. Co-defendant Harris was then placed in foster care. However, co-defendant Harris repeatedly ran away from her foster care placements and was committed several more times as a teenager. Co-defendant Harris testified that she started prostituting herself at seventeen. Co-defendant Harris further testified that, when she was reunited with Ms. Harris after she turned eighteen, she and Ms. Harris engaged in prostitution together.

Co-defendant Harris admitted that she had been previously diagnosed with bipolar disorder, depression, and borderline personality disorder with antisocial characteristics. Co-defendant Harris further admitted that the last time she was involuntarily committed was after she and the Defendant had started dating. Co-defendant Harris had given the Defendant a letter stating that she wanted a group of men to take her to the woods, rape

-10-

her, and kill her. The Defendant showed the letter to police officers, and co-defendant Harris admitted that when the officers conducted a welfare check, she fought them, had to be "hogtied," and tried to kick the windows out of a police cruiser. Co-defendant Harris further admitted that she told the medical staff the last time she was committed that she had "blackout rages" and that she was informed that she suffered from "impulsive mood swings."

The State also presented the testimony of several witnesses who had interacted with the Defendant during his incarceration pending trial. A correctional officer overheard the Defendant say on May 6, 2012, that "he had worked with [co-defendant Harris] for over a week about . . . what she should say if they were ever caught" and "that she had messed it up." The Defendant also said that co-defendant Harris was "insane" and did not "know what she[ was] doing."

Larry Samples testified that he was incarcerated and had been housed at the same facility as the Defendant. Mr. Samples testified that the Defendant had given him a letter and that the Defendant wanted him to rewrite the letter and correct the spelling errors. In the letter, the Defendant stated that co-defendant Harris had killed the victim. However, Mr. Samples claimed that the Defendant had admitted to killing the victim himself. Mr. Samples admitted that he gave the Defendant's letter to the District Attorney General's Office in exchange for being transferred to a different facility. Mr. Samples further admitted that he had prior convictions for theft, burglary, vandalism, and "drug stuff."

Barry Spicer testified that he was incarcerated and had been housed on the same floor as the Defendant. Mr. Spicer claimed that the Defendant had said that he and co-defendant Harris were arguing "about money" when "she flipped out and . . . picked up a hammer and started beating" the victim with it. Mr. Spicer further claimed that the Defendant said that he "took the hammer from [co-defendant Harris] and finished beating [the victim] with the hammer" and "ended up killing the guy pretty fast."

According to Mr. Spicer, the Defendant said that "he was sorry [because] it wasn't supposed to be like this." Mr. Spicer also claimed that the Defendant said that co-defendant Harris was "mentally unstable" and that "anything she said wouldn't be reliable." Mr. Spicer admitted that he had prior convictions for armed robbery and theft. Mr. Spicer further admitted that he was put back on trustee status after speaking to investigators about the Defendant.

## II. Defendant's Proof

The Defendant testified that he met co-defendant Harris in 2009 when a mutual friend brought her to his house and they "ended up hooking up together that night." The Defendant denied ever raping, striking, choking, or intimidating co-defendant Harris

during their relationship. Instead, the Defendant claimed that co-defendant Harris was repeatedly violent towards him and that they had to move around a lot because she "would have episodes" that escalated to arguments and fights.

As an example, the Defendant pointed to a letter co-defendant Harris had given him. The Defendant claimed that he asked co-defendant Harris to write the letter because she repeatedly asked him to find a group of men to take her to the woods, rape her, and kill her. The Defendant further claimed co-defendant Harris had threatened to "get [it] done by herself" if he did not do what she wanted.

The Defendant also presented the testimony of one of the responding officers. The officer recalled that the letter gave the Defendant "and a group of his friends" permission to "f--k [co-defendant Harris] until she couldn't breathe." When the officers checked on co-defendant Harris, she said that "she had wanted to harm herself." Co-defendant Harris began "kicking and screaming and biting" when the officers attempted to take her to the hospital for a mental evaluation. It took three officers to get co-defendant Harris out of her trailer and into a police cruiser. Once inside the cruiser, co-defendant Harris tried to "kick the window out" and beat her head against the window.

The Defendant admitted that he provided co-defendant Harris with synthetic cannabinoids because "that was one of her things" and that "if she didn't have it . . . she'd go berserk and yell and scream and kick." The Defendant denied using synthetic cannabinoids himself and claimed that he had only tried "bath salts" one time around a month before the victim's murder. The Defendant also denied that he was fired from his job for being intoxicated at work and unable to perform his duties. Instead, the Defendant claimed that he quit working at the South Roan Service Center because the owner was routinely late in paying him.

The Defendant testified that he knew the victim from his job at the shop. The Defendant stated that he and the victim "really got along" and that the victim was his best friend. The Defendant continued, stating that the victim treated him and co-defendant Harris "as his children" and was "a very good man." The Defendant claimed that, at the time of the murder, the victim was "dying of cancer." However, the Defendant also claimed that the victim did not provide him with details about what type of cancer he was suffering from or what kind of treatment he was undergoing.

The Defendant denied that he went to the shop with the victim on April 17, 2012, in an effort to get his job back. The Defendant claimed that the owner had called him that day and asked him to come to the shop because the victim was there and talking to the owner about the Defendant's getting his job back. The Defendant testified that this upset him because the owner was trying to use his friend to lure him back to working at the shop.

The Defendant claimed that when he got home from the shop that afternoon, he found Ms. Harris in the trailer trying to hang decorative "vines" over the kitchen window. According to the Defendant, Ms. Harris was using "a big [twenty-two] ounce" framing hammer to put nails in the wall. The Defendant testified that he got Ms. Harris a smaller hammer to use instead of the framing hammer. The Defendant further testified that he did not know why the decorative "vines" were not in any of the pictures of the trailer taken during the subsequent searches of the trailer.

The Defendant claimed that after he gave Ms. Harris the smaller hammer, he went to the bedroom to check on co-defendant Harris and the baby. According to the Defendant, co-defendant Harris was "aggravated" because Ms. Harris kept waking the baby up with her hammering. The Defendant testified that he told Ms. Harris to leave the trailer for a few hours to get her "out of [co-defendant Harris's] hair." The Defendant claimed that co-defendant Harris "didn't like that" and that they began arguing about Ms. Harris "taking the car." The Defendant also noted that co-defendant Harris did not have any synthetic cannabinoids that day because they could not afford them.

Despite the fact that he and co-defendant Harris were "blazing at each other," the Defendant suggested that they invite the victim to come over and "have supper and drink some." The Defendant claimed that he also wanted to pay the victim back twenty dollars that they had borrowed from him. The Defendant further claimed that this was the only amount of money the victim ever lent them. The Defendant recalled that this was around 4:30 p.m. According to the Defendant, the baby was asleep and the toddler was playing in her bedroom.

The Defendant testified that he and co-defendant Harris were sitting on the couch continuing to argue when the victim knocked on the door. The Defendant claimed that he answered the door and warned the victim that "World War III [was] going on" because he and co-defendant Harris were "arguing over some stupid BS." According to the Defendant, the victim asked if he could help and sat down on the couch. The Defendant testified that he explained to the victim that they were arguing about Ms. Harris's having taken the car and that co-defendant Harris was "nuts" and "stupid."

At some point, according to the Defendant, co-defendant Harris went to the back bedroom to check on the baby. She then came out "yelling at" the Defendant. The Defendant claimed that her yelling woke the baby up and the baby started to cry. The Defendant testified that he screamed at co-defendant Harris, "[G]o get the damn baby and shut the f--k up." According to the Defendant, co-defendant Harris walked past the victim on her way to the back bedroom.

The Defendant claimed that he did not see what happened next because he was trying to avoid making eye contact with co-defendant Harris. The Defendant testified

that the victim said, "[Y]oung lady, there's no sense you acting like that towards your momma." The Defendant claimed that he then heard "like a smack" and looked up to see co-defendant Harris "just waylaying" the victim with a hammer. The Defendant further claimed that he jumped up and shoved co-defendant Harris away from the victim, then she dropped the hammer. The Defendant testified that he checked on the victim and that the victim "was not responding at all."

The Defendant claimed that he "started screaming" at co-defendant Harris to call 911. The Defendant explained that co-defendant Harris had their cell phone. According to the Defendant, however, she refused to call 911 because she was afraid that they would both go to jail. The Defendant claimed that co-defendant Harris begged him not to let her go to jail. The Defendant further claimed that co-defendant Harris tried to move the victim's body by herself and that it just fell to the living room floor. The Defendant recalled that there was blood all over the living room.

The Defendant claimed that he eventually agreed to help co-defendant Harris cover up the victim's murder. According to the Defendant, they moved the victim's body to the spare bedroom together. The Defendant claimed that, after they moved the victim's body, Ms. Harris returned to the trailer. The Defendant testified that co-defendant Harris told Ms. Harris that she had killed the victim. According to the Defendant, Ms. Harris told him that they could not let co-defendant Harris go to jail. The Defendant continued, claiming that both Ms. Harris and co-defendant Harris began arguing with him about calling the police.

The Defendant testified that after arguing with Ms. Harris and co-defendant Harris, he again agreed to help cover up the victim's murder. The Defendant suggested that they leave the victim's body on Spivey Mountain and make it look like he had been robbed. The Defendant claimed that Ms. Harris suggested that they take the victim's wallet. The Defendant further claimed that he gave the wallet to Ms. Harris without ever seeing what was inside it. The Defendant reiterated that he did not know if the victim had any money in his wallet when he was killed. However, the Defendant claimed that the victim kept most of his money at his house and did not carry it with him.

The Defendant testified that he, co-defendant Harris, and Ms. Harris cleaned the trailer. According to the Defendant, he cut the carpet out of the bedroom after the children were asleep and left the victim's body rolled up in the carpet in the bedroom overnight. The Defendant claimed that the next morning, Ms. Harris backed the victim's truck up to the front porch and that he and co-defendant Harris dragged the victim's body out of the trailer. The Defendant testified that he then dumped the victim's body on Spivey Mountain and drove the victim's truck to his mother's trailer. The Defendant denied seeing Mr. Banner or threatening him with a wrench when he took the victim's truck to his mother's trailer.

-14-

The Defendant testified that he suggested to co-defendant Harris and Ms. Harris that they leave town because he knew they would eventually be caught by the authorities. However, the Defendant claimed that it was co-defendant Harris and Ms. Harris's idea to go to Florida. The Defendant admitted that they all spent the night at Ms. Pate's apartment before they left for Florida, but he denied ever telling Ms. Pate that he could not take care of his children. The Defendant also denied that he told anyone his brother had urinated on the section of the couch left outside the trailer. The Defendant admitted that they took several photographs while they were in Florida, including several photographs that he took of co-defendant Harris's buttocks while she was in a bikini.

The Defendant denied that he killed the victim and claimed that he had no idea on April 17, 2012, that co-defendant Harris would kill the victim. The Defendant insisted that his testimony was truthful. The Defendant admitted that he never called the police and never told the investigators where he had left the victim's body. The Defendant asserted that he was still "very much" in love with co-defendant Harris. The Defendant denied that he ever told Mr. Samples or Mr. Spicer that he killed the victim.

The Defendant also presented the testimony of Ted Cooper, a fellow inmate housed at the same facility as the Defendant and Mr. Spicer. Mr. Cooper testified that Mr. Spicer had asked him what he thought Mr. Spicer could get for telling the authorities that the Defendant had admitted to killing the victim. Mr. Cooper further testified that he asked Mr. Spicer if the Defendant had admitted to the murder, and Mr. Spicer said that the Defendant had not. Additionally, Mr. Cooper testified that the Defendant never admitted killing the victim to him.

### III. Verdict

Based upon the foregoing, the jury convicted the Defendant as charged of first degree premeditated murder, first degree felony murder, tampering with evidence, and abuse of a corpse. The trial court approved the jury's verdict as the thirteenth juror. At a subsequent sentencing hearing, the trial court merged the two first degree murder convictions and imposed a total effective sentence of life imprisonment.

### IV. Juror Questions

On the second day of trial, the trial court informed the attorneys that a juror had "asked the clerk when they [would] get to ask questions." The trial court had not previously addressed the issue and expressed that it wanted to avoid a situation where the witnesses were subjected to "twelve cross[-]examinations." The trial court stated that it would inform the jurors that "if an individual juror [had] a question they [could] write it on the pad, hand it to the bailiff, and submit it to the court before the witness [left] the stand." The trial court would then "submit the question to counsel and have them look at

the question[], and if one of them want[ed] to ask that question of the witness they [would] have the prerogative to do so." Defense counsel stated that he had no objection to that procedure and that he "like[d]" it. The trial court so instructed the jury. The jurors submitted only a few questions during the course of the trial.

The Defendant testified on the last day of trial. At the beginning of his direct examination, defense counsel noted that it was the Defendant's birthday. Defense counsel asked the Defendant how old he was and "how many years younger" co-defendant Harris was than the Defendant. The Defendant responded that he was forty-seven and that co-defendant Harris was "maybe twenty years" younger than him. While both parties had addressed the age difference between the Defendant and co-defendant Harris during trial, none of the attorneys had raised that issue with the prospective jurors during voir dire.

The Defendant was asked several questions about his background. At one point, he testified that he had moved to Florida when he was in his early twenties, got married, and had two children who were "grown now." The Defendant also said that, early in his relationship with co-defendant Harris, he assumed that she would "eventually find somebody else" because of "her young age."

The Defendant also testified about the fact that he "always got pot and [he] made sure [co-defendant Harris] had it" because of her violent behavior when she did not have access to marijuana or synthetic cannabinoids. As an example, the Defendant claimed that, shortly after the birth of their first child, he told co-defendant Harris that they had no drugs because they could not afford any and she "went into a rage" and hit him in the back of the head with "a hair straightener." The Defendant further explained that he "supplied [co-defendant Harris] with marijuana" because it "calm[ed] her down" and kept "her mood swings down where she[ was] not so agitated."

After this testimony, the trial court took its first break of the day. At the conclusion of the break, the trial court asked the attorneys to approach the bench. The following exchange then occurred:

> [Trial court]: I'm going to put a stop to the jury questions in just a moment, and this is the reason why. This is the question that was handed by one of the jurors to the bailiff. . . . ["]What is a [forty] year old man doing with an [eighteen] year old girl?["]
> [Defense counsel]: Jesus Christ.
> [Trial court]: ["]He has children older. Why not get [co-defendant Harris] real help instead of using pot?["]
> [Defense counsel]: Oh, my lord.

-16-

[Trial court]: So, I'm putting a stop to it right now, okay.  And -- and my . . .
[Defense counsel]: We need to find out who that is.
[First prosecutor]: No, I just think . . .
[Second prosecutor]: I'd -- don't address it or . . .
[Trial court]: I'm not
[Second prosecutor]: Just don't address it and whatever they give you just . . .
[Defense counsel]: God Almighty . . .
[Trial court]: All right.
[Defense counsel]: Yeah, keep that in the record.
[Trial court]: I'm going to keep this in the record.  Okay.  I'm going to mark it as an exhibit, but I'm not going to address it.
[First prosecutor]: Yeah, I think that's what you do.
[Trial court]: But, anymore questions that -- that [come] to the court I'm just -- I'm going to ignore them unless it's something I need -- I feel like I need to.  I'll -- I'll file them all in the record, but I'm going to ignore them.  But, I'm not even going to acknowledge this question, okay.
[Second prosecutor]: Yeah.
[Trial court]: But, this is why you can't let [jurors ask questions].  All right.  I just wanted you all to know and it will be in the record.

The jury returned to the courtroom, and defense counsel resumed his direct examination of the Defendant.

During the State's cross-examination of the Defendant, the trial court informed the attorneys during a bench conference that it had received another juror question.  The trial court stated that it had reviewed the applicable procedural rule on juror questions and that it believed that it was appropriate to ask the Defendant the question it had just received.  The trial court further stated that it would instruct the jury that it was "aware of your other question, but the court deemed it not to be appropriate and [it would] not be asked."  Defense counsel responded, "Thank you."

When the jury returned, the trial court instructed them again on the procedure for asking questions of witnesses.  The trial court then informed the jury that a question had been "submitted earlier" and that "the court deem[ed] it[ was] not appropriate."  The trial court continued, stating that it was "not an appropriate question to ask the witness, and that question [would] not be asked and that [was the trial court's] decision."  The trial court then instructed the jury not to hold the fact that the question would not be asked against the parties.

-17-

The issue regarding the unasked juror question was not raised again until a year after trial when defense counsel filed an amended motion for new trial the afternoon before the scheduled motion for new trial hearing. The amended motion alleged that the juror question revealed one of the jurors "to be corrupt" and that juror "should have been questioned and removed." The amended motion further alleged that the "taint this juror could have left upon the other members of the jury panel [could] not be known at this point, leaving the deliberation process and verdict in question."

The trial court denied the Defendant's motion for new trial on this issue and concluded that "this unusual incident was handled correctly by the court and had no effect on the verdict of the jury." The trial court stated that it viewed the juror question as "a juror thinking out loud based upon what they had just heard and thought it was proper to write it down and hand it to the judge." The trial court noted that neither of the parties objected when it stated that it would ignore the question. The trial court stated that it did not want to address the question with the juror for fear of it appearing that the trial court was commenting on the evidence. The trial court also noted that defense counsel had the opportunity to address the concerns raised in the juror question.[3]

## ANALYSIS

The Defendant contends that he was denied his right to a fair trial by an impartial jury because the written juror question presented during his testimony demonstrated that one of the jurors had "a decided prejudice and bias" against him. The Defendant argues that the juror question was "a statement of moral judgment" tantamount to the juror "having formed an opinion about the case" and the credibility of the witnesses. The Defendant further argues that it was possible that other jurors were "tainted by this same opinion." The State responds that the Defendant has waived this issue by failing to make a contemporaneous objection. The State further responds that the juror's question did not evidence a bias against the Defendant to a degree that the juror would have been unable "to apply the law impartially."

Both the Sixth Amendment of the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a defendant's right to an impartial jury. "'The impartial jury guaranteed by constitutional provisions is one which is of impartial frame of mind at the beginning of trial, is influenced only by legal and competent evidence produced during trial, and bases its verdict upon evidence connecting [the] defendant

---

[3] The trial court mistakenly believed that the juror question was asked during the State's direct examination of co-defendant Harris. However, the question was asked early during defense counsel's direct examination of the Defendant. While defense counsel did not have the opportunity to cross-examine co-defendant Harris about the concerns raised in the juror question as the trial court believed, co-defendant Harris was recalled during the State's rebuttal.

with the commission of the crime charged.'" State v. Hugueley, 185 S.W.3d 356, 377-78 (Tenn. 2006) (quoting State v. Lawson, 794 S.W.2d 363, 367 (Tenn. Crim. App. 1990)). A claim that the defendant's "right to an impartial jury was compromised can be based on an allegation that the jury was exposed to extraneous prejudicial information or that a juror harbored personal bias." State v. David Brian Howard, No. M2016-02256-CCA-R3-CD, 2017 WL 4051134, at *9 (Tenn. Crim. App. Sept. 13, 2017).

After the jury has been impaneled, individual jurors may be discharged prior to deliberations only if they are "unable or disqualified to perform their duties." State v. Cleveland, 959 S.W.2d 548, 551 (Tenn. 1997). Absent a showing that the juror is legally disqualified or there is inherent prejudice, the burden is on the defendant "to show that a juror is in some way biased or prejudiced." State v. Caughron, 855 S.W.2d 526, 539 (Tenn. 1993). The decision to discharge a juror and to select an alternate juror is left to the discretion of the trial judge. State v. Millbrooks, 819 S.W.2d 441, 445 (Tenn. Crim. App. 1991).

Similarly, a defendant may challenge a juror's qualifications post-verdict in a motion for new trial when bias or prejudice is actually shown to exist, can be presumed from the circumstances, or "when a juror conceals or misrepresents information tending to indicate a lack of impartiality." State v. Akins, 867 S.W.2d 350, 355 (Tenn. Crim. App. 1993). This type of challenge to a juror's qualifications was known at common law as propter affectum, or a challenge "on account of prejudice," and could be made post-verdict as opposed to propter defectum, a challenge "on account of defect" based on general disqualifications, which had to be made prior to the jury's verdict. Carruthers v. State, 145 S.W.3d 85, 94 (Tenn. Crim. App. 2003). In a propter affectum challenge, the defendant "bears the burden of providing a prima facie case of bias or partiality." Akins, 867 S.W.2d at 355.

The State contends that the Defendant has waived this issue by not raising a contemporaneous objection to the juror's qualifications. It is true that "[p]arties [cannot] knowingly permit incompetent jurors to try their cases, and then take advantage of the incompetency when the verdict is adverse to them." Helton v. State, 530 S.W.2d 781, 783 (Tenn. Crim. App. 1975) (quoting Thomas v. State, 75 S.W. 1025, 1026 (Tenn. 1903)). Put another way, if the defendant becomes aware of a juror's disqualification during the course of trial, then the defendant must take action as soon as they "received the information." Id. (quoting Thomas, 75 S.W. at 1026). However, defense counsel's request that the trial court determine who wrote the juror question was sufficient to preserve this issue for our review in light of the fact that the trial court was the first to become aware of this issue, brought it to the attention of the parties, and immediately rejected defense counsel's request to investigate which juror wrote the question.

At common law, questioning of witnesses by jurors was strongly discouraged. State v. James, 315 S.W.3d 440, 458 (Tenn. 2010). However, in 2003 the Tennessee Rules of Criminal Procedure were amended to provide as follows:

> **Juror Questions of Witnesses.** In the court's discretion, the court may permit a juror to ask a question of a witness. The following procedures apply:
> (1) *Written Submission of Questions.* The juror shall put the questions in writing and submit it to the judge through a court officer at the end of a witness' testimony. <u>A juror's question shall be anonymous and the juror's name shall not be included in the question</u>.
> (2) *Procedure After Submission.* The judge shall review all such questions and, outside the hearing of the jury, shall consult the parties about whether the question should be asked. The judge may ask the juror's question in whole or in part and may change the wording of the question before asking it. The judge may permit counsel to ask the question in its original or amended form in whole or part.
> (3) *Jury Instructions.* When juror questions are permitted the court shall instruct jurors early in the trial about the mechanics of asking a question and <u>to give no meaning to the fact that the judge chose not to ask a question</u> or altered the wording of a question submitted by a juror.
> (4) *Retaining Questions for Record.* All jurors' questions--whether approved or disapproved by the court--shall be retained for the record.

Tenn. R. Crim. P. 24.1(c) (emphases added).

This court has previously rejected the argument that juror questioning of witnesses pursuant to Rule 24.1(c) violates a defendant's right to an impartial jury. State v. Larry Scott Reynolds, No. M2009-00185-CCA-R3-CD, 2010 WL 5343305, at *31-33 (Tenn. Crim. App. Dec. 16, 2010) (citing James, 315 S.W.3d at 458-59). Additionally, "minor deviations from the approved procedure for asking [juror] questions are not grounds for finding an abuse of discretion." State v. Shanterrica Madden, No. M2012-02473-CCA-R3-CD, 2014 WL 931031, at *9 (Tenn. Crim. App. Mar. 11, 2014) (citing James, 315 S.W.3d at 460). Here, the trial court followed the procedure outlined in Rule 24.1(c), which required that the question be anonymous. The trial court also instructed the jury that it would not ask the question because it was "not appropriate" and not to hold that decision against the parties.

As noted earlier, however, a defendant's right to an impartial jury can be violated when "the jury was exposed to extraneous prejudicial information or [when] a juror harbored personal bias." Howard, 2017 WL 4051134, at *9. With respect to extraneous prejudicial information, "[b]oth fact and opinion can comprise extraneous information

influencing a jury." State v. Crenshaw, 64 S.W.3d 374, 392 (Tenn. Crim. App. 2001). However, "[e]xtraneous means 'coming from without.'" Id. at 393 (quoting State v. Coker, 746 S.W.2d 167, 171 (Tenn. 1988)).

"[I]nformation that can be inferred from the evidence offered at trial is not extraneous information." Crenshaw, 64 S.W.3d at 393. Nor are "a juror's subjective thoughts, fears, and emotions" considered extraneous information. Caldararo ex rel Caldararo v. Vanderbilt Univ., 794 S.W.2d 738, 742 (Tenn. Crim. App. 1990). Likewise, "[i]ntra-jury pressure or intimidation are 'internal matters that do not involve extraneous information or outside influence.'" Howard, 2017 WL 4051134, at *10 (quoting Caldararo, 794 S.W.2d at 742). As such, the Defendant has failed to establish that the opinion expressed in the juror question as well as the potential impact that opinion had on the other jurors amounted to extraneous prejudicial information.

This court has previously described bias in a juror as "a 'leaning of the mind; propensity or prepossession towards an object or view, not leaving the mind indifferent; [a] bent; [for] inclination.'" Akins, 867 S.W.2d at 354 (alterations in original) (quoting Durham v. State, 188 S.W.2d 555, 559 (Tenn. 1945)). As stated earlier, the defendant "bears the burden of providing a prima facie case of bias or partiality." Id. at 355. Bias will be presumed only upon the demonstration of "either an affirmative statement of bias, willful concealment of bias, or failure to disclose information that would call into question the juror's bias[.]" Smith v. State, 357 S.W.3d 322, 348 (Tenn. 2011). The last two of those situations are not present here as the prospective jurors were not asked about the age difference between the Defendant and co-defendant Harris during voir dire. As such, our decision turns on whether the juror question can be considered an affirmative statement of bias.

Not every "'passion' or emotion . . . is tantamount to jury misconduct." Jenkins v. Commodore Corp S., 584 S.W.2d 773, 778 (Tenn. 1979). To that end, "any emotion in the minds of the jurors [that] legitimately and naturally flow[s] from the [] facts of the case or from the tactics employed by counsel . . . cannot be categorized as improper or unjustified." Id. Similarly, this court has previously held that defendants are "not guaranteed jurors who form no opinions based on the actions of defense counsel, but only jurors who are impartial and who base their verdict on the evidence presented at trial." Howard, 2017 WL 4051134, at *10.

We conclude that the Defendant failed to establish a prima facie case of bias or partiality as the juror's question was a response to the Defendant's testimony that preceded it and not an affirmative statement of bias. During his testimony, the Defendant noted co-defendant Harris's "young age," stated that co-defendant Harris was "maybe twenty years" younger than him, pointed out the fact that he had two children who were "grown now," and testified at length about why he "supplied [co-defendant Harris] with

-21-

marijuana" in an attempt to treat her various mental health issues. As such, we conclude that the Defendant failed to establish a prima facie case of juror bias based upon the juror question submitted to the trial court. Accordingly, we affirm the judgments of the trial court.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE